*United States v. Mattis, Rahman*

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2019

Argued: June 23, 2020
Decided: June 30, 2020

Docket No. 20-1713

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

V.

COLINFORD MATTIS, UROOJ RAHMAN,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of New York
No. 20-403 – Margo K. Brodie, *Judge*.

Before:      NEWMAN, HALL, and LYNCH, *Circuit Judges.*

The government appeals from an order of the district court (Brodie, *J.*) granting defendants Colinford Mattis and Urooj Rahman release pending trial. Because we cannot say that we are left with a "definite and firm conviction" that the district court erred in determining that the conditions imposed are adequate to reasonably assure the defendants do not constitute a danger to the community, we AFFIRM the order of the district court.

Judge Newman dissents in a separate opinion.

---

DAVID K. KESSLER (Kevin Trowel, Assistant United States Attorneys *on the brief*), *for* Richard P. Donoghue, United States Attorney, Eastern District of New York, Brooklyn, NY, *for Appellant.*

SABRINA P. SHROFF, Law Offices of Sabrina P. Shroff, New York, NY, *for Appellee Mattis.*

PAUL L. SHECHTMAN (Margaret E. Lynaugh *on the brief*), Bracewell LLP, New York, NY, *for Appellee Rahman.*

Brian A. Jacobs, Morvillo Abramowitz, Grand Iason & Anello PC, New York, NY, Edward Y. Kim, Krieger Kim & Lewin LLP, New York, NY *for Amici Curiae* Former Federal Prosecutors (joined by Joshua L. Dratel, Dratel & Lewis, P.C., New York, NY *for* National Association of Criminal Defense Lawyers), *in support of Appellees.*

PETER W. HALL, *Circuit Judge*:

The United States appeals from a June 1, 2020 order of the United States District Court for the Eastern District of New York (Brodie, *J.*), affirming Magistrate Judge Steven M. Gold's release of Colinford Mattis and Urooj Rahman on bail pending trial.

On May 30, 2020, the defendants-appellees were arrested following an incident in which defendant Rahman allegedly threw a Molotov cocktail into an unoccupied police vehicle and Mattis allegedly acted as the getaway driver.[1] Magistrate Judge Gold ordered each defendant released on $250,000 bond with conditions. The government appealed and Judge Brodie affirmed. On June 5, 2020, a panel of this Court granted the government's motion to stay the release order pending resolution of this appeal.

The government contends that the district court clearly erred by not explicitly stating it considered the statutory presumption favoring detention that arises in this case and by ultimately granting release. For the reasons that follow, we affirm the determination of the district court.

---

[1] A Molotov cocktail is an incendiary device that consists of a glass bottle filled with a flammable liquid and an ignition source that is lit before releasing the bottle.

## I.

According to a complaint filed by the government, in the early morning of May 30, 2020, amidst city and nationwide protests against police brutality, Mattis and Rahman were driving around Brooklyn in Mattis's vehicle. At one point, Rahman exited the vehicle and threw a lit Molotov cocktail into an unoccupied and previously vandalized police vehicle. Rahman then returned to the vehicle, which Mattis was driving, and the pair fled. The government also offered evidence that, earlier that evening, Rahman attempted to distribute Molotov cocktails to other individuals. Shortly after the pair fled, the defendants were apprehended and taken into custody by the New York Police Department. During the arrest of the defendants, the police officers observed in plain view in Mattis's vehicle items that could be used to build a Molotov cocktail, including a lighter, a beer bottle filled with toilet paper and a liquid suspected to be gasoline, and a gasoline tank. The government thereafter filed a complaint charging defendants with violating 18 U.S.C. § 844(i), which prohibits "maliciously damag[ing] or destroy[ing], or attempt[ing] to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign

commerce." Mattis and Rahman were then brought before Magistrate Judge Gold for a detention hearing.

Pursuant to 18 U.S.C. § 3154(1), Pretrial Services collected information pertaining to Mattis and Rahman, their risks of flight, and the danger that their releases would pose to another person or the community. The Pretrial Services officers assigned to Mattis and Rahman each recommended that the defendants be released on bond co-signed by financially responsible suretors with additional conditions imposed. These conditions included the defendants surrendering all travel documents, being subject to random home and employment visits, and being subject to home detention with location monitoring.

Colinford Mattis appeared via video conference for the hearing before Magistrate Judge Gold on June 1, 2020. Mattis's counsel emphasized that after a "detailed interview" with Mattis, the Pretrial Services officer concluded that the proposed bail package would reasonably assure the safety of the community and Mattis's return to court. Gov't App. 18. Mattis's counsel also described Mattis's close family ties, including his three foster children, two of whom he is in the process of adopting. Numerous suretors volunteered in support of Mattis, including his brother, sisters, and close friends.

The government argued in those proceedings that despite the recommendation of Pretrial Services the bail conditions were inadequate because they assumed Mattis would act in a rational manner. The government contended that "Colinford Mattis has not demonstrated himself to be a rational person[,]" because Mattis was willing to risk his career and the advantage of his education by participating in this crime. Gov't App. 24. As counsel for the government explained:

> [I]t is difficult for me, frankly, to comprehend how somebody in his position with his background would do what he did and I have great difficulty understanding how we can make any assumption about how a bail package like the one that was suggested by Ms. Shroff is actually going to protect the public and is going to ensure that he is going to return to court as required.

Gov't App. 26. During questioning by the magistrate judge, the government conceded that its claim that Mattis was irrational and would not comply with the bail conditions was based solely on the facts of the crime.

> THE COURT: When you say that you question his rationality, I understand the argument and I don't mean to belittle what happened . . . I just want to make sure that I am understanding the scope of your argument and asking you whether there are other aspects of his background or the government's information about him that you're prepared to put on this record other than his behavior on the night in question that demonstrates his lack of attention to incentives, rewards and punishment.
> MR. RICHARDSON: Not at this time, Your Honor.

6

Gov't App. 27. In concluding his argument to the court, counsel for the government emphasized: "I do not believe that he can rebut the presumption that he is a danger to the community and a danger of flight." Gov't App. 27. Mattis's attorney responded, "I believe that the bail package completely addresses any concerns at all and I fairly rebutted this presumption." Gov't App. 27.

After considering the arguments, the magistrate judge rejected the government's contention that Mattis is irrational and therefore not entitled to bail:

> I . . . believe that one night of behavior is not a basis to reject someone's ability to make rational decisions and that home detention assured by the plaintiff and the well-being of his entire family and several high earning colleagues and friends should be an adequate deterrent for further danger to the community even assuming the accuracy of every allegation of the government in its complaint.

Gov't App. 27–28. The magistrate judge set bond in the amount of $250,000 and imposed the conditions listed in the Pretrial Services report, which include home detention and a requirement that Mattis wear a GPS location monitor.

On the same day, Urooj Rahman also appeared via video conference for a bail hearing before Magistrate Judge Gold. As with Mattis, Pretrial Services recommended home confinement with GPS monitoring and a $250,000 bond. Numerous family members and friends volunteered to be suretors for

7

Rahman, and the government argued that the bail package was insufficient to rebut the presumption that Rahman is a danger to the community and a risk of flight. Before the court, Rahman's attorney described Rahman's work as a public interest lawyer. Her attorney also pointed out her family ties, which include living with and being responsible for the care of her mother whose health is declining. He argued that Rahman is unlikely to commit another crime: "this is her first arrest. She . . . has no history of substance abuse or any other risk factor that would suggest any propensity for future criminality or failure to abide by the Court's instructions. Ms. Rahman also comes from a tight, solid and law abiding family." Gov't App. 48–49. In response, the government argued that Rahman's previously spotless record weighed in favor of denying bail: "[T]his defendant, who had so much to lose, threw that Molotov cocktail anyhow." Gov't App. 55.

In concluding his argument before the magistrate judge, Rahman's attorney raised the additional consideration of coronavirus spreading in the Metropolitan Detention Center, where Rahman was confined. Gov't App. 55–56 ("The people in federal custody [have] . . . six times the rate of infection [of] the U.S. population."). The magistrate judge, having reviewed the Pretrial Services report

and the list of suretors and having considered the arguments made by the government and the defense during the video conference, explained:

> It's not an easy case. The conduct of the defendant is extremely grave at least as alleged by the government, but I do take into account the fact that the defendant does not have a prior record and that she has a number, a large number of responsible suretors who are ready to vouch for her.

Gov't App 56. The magistrate judge ruled that the Rahman could be released subject to a $250,000 bond and the conditions recommended in the Pretrial Services report, including home confinement and a requirement that she wear a GPS monitoring device.

The government appealed Magistrate Judge Gold's orders of release to the district court. In a hearing before Judge Brodie, the government again argued that the defendants' backgrounds made them more, rather than less, dangerous: "these aren't people with nothing to lose . . . . They have education, they have a future, they have careers, and they were willing to throw that all away . . . ." Gov't App. 73.

Judge Brodie considered the government's argument and asked Rahman's defense counsel why Rahman is not a danger to the community. Noting that she was aware that Rahman had no criminal record and her work representing

9

individuals in housing court, Judge Brodie questioned what made Rahman commit the charged crime, "and what has changed since that day that would prevent her from doing so in the future?" Gov't App. 78. Rahman's counsel responded that the experience of Rahman's arrest had been "tremendously eye opening" and the conditions of her bail mean that "[e]verything she does now affects her family's financial [security], and it affects her . . . mother's health and ability to continue living her life." Gov't App. 79.

Responding to the same question from Judge Brodie, Mattis's defense counsel emphasized the restrictions of the bail conditions and Mattis's close family ties:

> [H]is family works as moral suasion for him. He lives in the same home as his sister Lyris, who is on the line, and can confirm to the Court she will do everything that is asked of her to make sure that Colin abides by the conditions set by this bond. Not only that, he will be under strict Pretrial Services supervision and, of course, he will have an attorney who is dogged in her own perseverance to make sure her client complies with all of the conditions set by this court. It is the conditions itself that ameliorates the danger.

Gov't App. 84–85.

Reviewing the magistrate judge's orders de novo, Judge Brodie found the bail conditions set by Magistrate Judge Gold to be sufficient. Judge Brodie explained that the seriousness of the offense and the strength of the evidence

10

against the defendants cut against release, but that these factors were outweighed by the history and characteristics of the defendants and their ties to their communities.

> [B]ased on the . . . the fact that they have no prior criminal history, the fact that they were both employed . . . the fact that they both live at the same address for almost their entire life . . . , the fact that Mr. Mattis has foster children at home that he's responsible for, and that Ms. Rahman has her own mother that she is responsible for, and based on the bail conditions set by Judge Gold, I find that all of the factors weigh in favor of release . . . .

Gov't App. 86.

In sum, Pretrial Services, Magistrate Judge Gold, and Judge Brodie all concluded, notwithstanding the acknowledged seriousness of the charged offense, that bail is appropriate for both Rahman and Mattis based on the absence of any criminal records and on their family obligations, their ties to the community and the number of suretors who support them.

Following hearings before Magistrate Judge Gold and Judge Brodie, Mattis and Rahman were each released on bonds executed in the amount of $250,000 secured by multiple family members and friends, and subject to a number of conditions, including home detention (to be enforced by location monitoring) with certain limited exceptions for travel outside of the home within only New York

11

City or Long Island. Under the conditions of release, Mattis and Rahman are also prohibited from having contact with each other except in the presence of counsel.

On June 2, the government filed an emergency motion to stay the district court's order to release Mattis and Rahman, arguing that irreparable harm would result from the defendants' release. After oral arguments on June 5, a panel of this Court granted the government's motion and ordered that this appeal be heard on an expedited basis. Pursuant to that order, Mattis and Rahman were remanded into custody and are currently being held at the Metropolitan Detention Center in Brooklyn.

II.

A district court is instructed to order the pre-trial detention of a defendant if, after a hearing, the judge "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The parties agree, given the nature of the crimes charged, that there is a presumption that "no condition or combination of conditions will reasonably assure . . . the safety of the community," which applies to the courts' consideration of the orders before us. 18 U.S.C. § 3142(e)(3). This presumption may be rebutted by the defendant, who

"bears a limited burden of production . . . by coming forward with evidence that he does not pose a danger to the community." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "Once a defendant has met his burden of production . . . the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court. Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community." *Id.*

In making its determination as to whether a defendant poses a danger to the community, the district court must consider the following factors set forth in 18 U.S.C. § 3142(g):

> (1) the nature and the circumstances of the offense charged. . .;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including [his] character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and . . .
> (4) the nature and seriousness of the danger to any person or to the community that would be posed by the person's release.

*See also Mercedes*, 254 F.3d at 436 ("To determine whether the presumption[] of dangerousness . . . [is] rebutted, the district court considers" the above factors.).

13

The government makes two arguments on appeal.  First, it contends the district court erred by failing to address the statutory presumption that "no condition or combination of conditions will reasonably assure . . . the safety of the community."  18 U.S.C. § 3142(e)(3).  Second, the government argues that the district court clearly erred when it found that the bail conditions were sufficient to assure the safety of the community and when it found that the statutory factors to be considered weigh in favor of the defendants' detention.

"As a rule, we apply deferential review to a district court's [bail determination] and will not reverse except for clear error."  *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *see also United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000) ("We review the district court's determination that a package of bail conditions will prevent danger to the community for clear error."). The clear error standard applies not only to the factual predicates underlying the district court's decision, but "also to its overall assessment, based on those predicate facts, as to the risk of flight or danger presented by defendant's release." *United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004).  That is, "[t]he determination that a package of bail conditions will protect the public from a purportedly dangerous defendant is a mixed question of law and fact which we

14

review for clear error." *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995) (citations omitted); *but see United States v. Shakur*, 817 F.2d 189, 197 (2d Cir. 1987) ("[T]he court's ultimate finding may be subject to plenary review if it rests on a predicate finding which reflects a misperception of a legal rule applicable to the particular factor involved."). We will find clear error only where, "on the entire evidence[,] we are left with the definite and firm conviction that a mistake has been committed." *Sabhnani*, 493 F.3d at 75 (quotation marks omitted).

III.

There is no question that the evidence before the district court demonstrated that the crimes charged are serious and the defendants' conduct on the night of their arrests could well have resulted in significantly more harm than it did. By affirming the district court's order to release the defendants on the conditions imposed, we do not seek to minimize the severity of the offense. Rather, we recognize the constraints on our appellate review and the fact that the gravity of an offense is not the only factor to be considered by the district court in deciding whether the conditions of release are adequate to ensure the defendants will not flee and do not constitute a continuing threat to the community.

We do not find persuasive the government's first argument that, because the district court did not refer explicitly to the presumption during the bail hearing, the court must have failed to address the statutory presumption against releasing the defendants. At oral argument before this panel, the government conceded that its argument for why and how the presumption should apply was presented to the district court in its memorandum advocating detention. The government does not contest that the district court examined the § 3142(g) factors—the precise factors that we have said must be considered to determine whether the presumption is rebutted. *See Mercedes*, 254 F.3d at 436. It is clear from the record, moreover, that the district court grappled with why it should be persuaded that there is adequate assurance the defendants will not engage in this sort of "reckless, . . . violent" activity again in light of the dangerous nature of the charged offense, which gives rise to the presumption against release. Gov't App. 78.

In addition, the burden on the defendants is one of production, *not* persuasion, and it is clear from the record that the defendants produced evidence from which the district court could infer that they do not pose a danger to the community. As we have repeatedly noted, albeit in a somewhat different context,

we do not require "robotic incantations" by district court judges in order to hold that the obligation to consider statutory factors has been satisfied. *See e.g.*, *United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (*en banc*); *cf. Xiao Ji Chen v. U.S. Dep't. of Justice*, 471 F.3d 315, 336 n.17 (2d Cir. 2006) (explaining that an immigration judge "need not engage in robotic incantations to make clear that he has considered and rejected a petitioner's proffered explanation." (internal quotation marks omitted)). We thus decline to create such an obligation here, where it is clear and undisputed that the magistrate judge and district court judge, both of whom are well-experienced, (1) had before them the government's papers pointing out that the presumption applied, (2) considered each of the factors that would bear on whether the presumption in favor of detention was rebutted, and (3) were not required by law to make explicit factual findings, *cf. United States v. Chimurenga*, 760 F.2d 400, 406 (2d Cir. 1985) ("[T]he [Bail Reform] Act requires the court to make factual findings only in the event of a detention order, and not when there is a release order." (citations omitted)).

The government's second argument—that the district court clearly erred in granting the defendants bail—presents a closer question, but it is an argument we ultimately reject. In order to reverse on these grounds, we must not only conclude

17

that the government showed, by clear and convincing evidence, that Mattis and

Rahman present a danger to the community that could not be mitigated by the

conditions of release, but also we must be left with a "definite and firm conviction"

that it was a mistake for the district court to hold otherwise. *See Sabhnani*, 493 F.3d

at 75 (citation omitted). We cannot do so on this record. The clearly erroneous

standard "plainly does not entitle a reviewing court to reverse the finding of the

trier of fact simply because it is convinced that it would have decided the case

differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). "Where

there are two permissible views of the evidence, the factfinder's choice between

them cannot be clearly erroneous. This is so even when the district court's findings

do not rest on credibility determinations, but are based instead on physical or

documentary evidence or inferences from other facts." *Id.* at 574 (citations

omitted).[2] It is not proper, therefore, to inquire as to whether or not we may have

decided the bail motion differently were we deciding it in the first instance, as our

---

[2] We recognize that a bail determination, which involves mixed questions of law and fact, may not be an obvious case in which to apply the traditional "clear error" framework cited in *Anderson*. We think this framework is appropriate here, however, not only because we have applied it in the past in evaluating whether the district court has erred in making a bail determination, but also because we read the government's argument to challenge the way the district court weighed the evidence. *See, e.g.*, *United States v. Baig*, 536 F. App'x 91 (2d Cir. 2013) (summary order).

review is limited to whether the district court committed error in reaching its determination.

In deciding whether the defendants should be released or detained, the district court carefully weighed the facts and evidence before it, including the Pretrial Services reports, which were prepared after extensive interviews with each defendant, and the arguments by both defendants and the government. The district court considered each of the factors set forth in 18 U.S.C. § 3142(g), explaining that, while the first two factors weigh against release because the crime was violent, reckless, and lawless, and the government's evidence is strong, release was warranted on balance. This determination was based not only on the defendants' strong ties to their communities and lack of criminal histories—the government has submitted no evidence indicating the defendants have ever engaged in activity similar to the charged conduct—but also on the finding that the bond condition provided "sufficient moral suasion" to ensure compliance with the conditions of release. Gov't App. 91. The bond condition notably leaves multiple family members and friends of each defendant liable for a quarter million dollars if the defendants violate any condition of release, including their home detention.

The government's position that the district court committed clear error in granting bail essentially boils down to an argument that the charged criminal conduct is so extreme and aberrant that it represents the new normal for the defendants, such that no set of conditions could reasonably assure the safety of the community. The acts alleged were indisputably dangerous and may have posed a serious risk to individuals in the surrounding areas. As a threshold matter, however, we must observe that the entire system for determining bail is premised on the belief that, at least to some extent, all criminal acts are aberrant. The very reason that Congress directed district courts to consider factors beyond just the severity of the offense is the recognition that an individual is more than the crime of which that individual has been accused.

In seeking to minimize consideration of the positive factors the district court weighed in favor of release, the government asserts that these factors existed before the crime and that it is therefore error to reason that these factors may provide a deterrent to future criminal conduct. Even putting aside that the district court was *mandated* to consider factors in addition to the facts of the crimes the defendants are charged with having committed, the district court made clear that the "moral suasion" on which it rested part of its decision was different than that

which existed before the criminal action took place. Gov't App. 91. Though Mattis and Rahman both had responsibilities to their families and communities before they were charged with this offense, the financial futures of their families and friends were not dependent on their compliance with the law and the other conditions of their release. Now that this associational dependence and the resulting moral obligations are front and center in any behavioral calculus the defendants will undertake, the district court was certainly allowed to consider the effects on the defendants of these changes that have come about as a result of the bond conditions imposed.

Nor was it clear error for the district court to put the weight it apparently did on the defendants' characteristics and positive past histories. We are aware of no case where the fact that, prior to the offense charged, the defendants lived lives fully in accordance with the law, dedicated those lives to societal betterment, and were employed in a profession that values ethics somehow militates *against* granting bail. If now a defendant's life history and characteristics can support detention, on the one hand, because that history demonstrates the defendant engaged in bad acts, and on the other hand, because the history is so spotless and impressive that the defendant should have "known better," the inquiry into a

defendant's background may well become meaningless. We decline to endorse such a "heads I win, tails you lose" zero-sum analysis.

Indeed, our prior caselaw is persuasive that the district court did not clearly err in granting defendants' motions to be released on bail, and this case stands in stark contrast to those cases where we have held a district court clearly erred by releasing defendants. In *United States v. Chimurenga*, for example, we concluded that the district court did not clearly err in ordering defendant Chimurenga released on bail. 760 F.2d at 406. The defendant, who had no criminal record and had been working on a doctorate at Harvard in public policy, was charged with conspiracy to commit armed robbery. *Id.* at 402. The government alleged that Chimurenga was the leader of a group connected to an armed robbery in New York that resulted in the death of an armored truck guard and two police officers. *Id.* At the bail hearing, the government presented strong evidence showing Chimurenga's involvement in the conspiracy. *Id.* Before the district court Chimurenga submitted evidence from his friends and family, including letters indicating their belief that he was not a flight risk, and testimony about Chimurenga's "strong sense of family" and their willingness to post money for bond in the amount of $500,000 as bail. *Id.* at 402–03. The district court ordered

Chimurenga released pending trial. *Id.* at 403. On appeal from that decision, we concluded that the district court's determination "that the government failed to demonstrate by clear and convincing evidence that Chimurenga was a danger to the community" was not clearly erroneous, declining to overrule the "experienced judgment" of the district court. *Id.* at 405.

Here, a number of these same factors exist. Neither defendant had a prior criminal record. As the Pretrial Services reports confirmed, both defendants had engaged in responsible careers and are dedicated to caring for their families. Both demonstrated they had deep ties to the community, and both had friends and family explain that they were willing to post $250,000 bonds as bail, for which they would be jointly and severally liable if defendants left their homes in a non-approved manner (a likely predicate to engaging in the type of conduct that may harm the community). And the facts here are arguably more favorable to these defendants' release than in *Chimurenga*. Unlike *Chimurenga*, there is no evidence that these defendants were members of an organized criminal or terrorist organization, who plotted over a period of time to engage in revolutionary acts. Although, as our dissenting colleague points out, their activities cannot be characterized as impulsive or momentary, neither did they engage in extensive

23

surreptitious planning; their actions were undertaken during a massive public protest, in which emotions ran high. There is no indication that the defendants are likely to engage in similar acts outside the context of that particular night. Unlike Chimurenga, who faced evidence that he advised co-conspirators "how to kill armored truck guards," *id*. at 402, here, there is no evidence that the defendants intended to harm people. While evidence was presented that their actions could have endangered individuals, there are no allegations that anybody was injured by their actions and no evidence was presented that they encouraged others to hurt people or that they themselves intended bodily harm to others.[3]

Cases in which we have found clear error offer a useful foil to our reaching that determination here. In *United States v. Ferranti*, for example, we held that the district court clearly erred in granting defendant's motion to be released on bail.

---

[3] While we acknowledge that *Chimurenga* is different from the instant case in that the statutory presumption in favor of detention applies here and did not in *Chimurenga*, this does not alter our analysis in a material way. As we explained in *United States v. Mercedes*, once a defendant meets his limited burden of production—"by coming forward with evidence that he does not pose a danger to the community or a risk of flight"—the presumption favoring detention becomes merely one of the factors "to be considered among those weighed by the district court." 254 F.3d at 436. Thus, concluding that the defendants have produced evidence before the district court from which the district court could find that they do not pose a danger to the community and are not a flight risk, the presumption becomes merely one additional factor that was not considered in *Chimurenga*. The burden of persuasion remains on the government, even in a presumption case. *Mercedes*, 254 F.3d at 436.

66 F.3d at 544. There, Ferranti was indicted on charges of (1) conspiracy to commit arson and arson resulting in death based on his involvement in a deadly arson of an *occupied* apartment building in which a firefighter died, (2) witness tampering in relation to the arson, (3) mail fraud, and (4) possession of a firearm by a convicted felon based on his possession of a loaded gun in a public place. Evidence was also presented to the district court that Ferranti (1) terrorized his tenants (including using a large dog to evict tenants), (2) threatened a mortgagee to whom Ferranti owed money (the mortgagee was later shot in the neck by an unidentified man; he survived), (3) attempted to murder a criminal associate, and (4) ordered the murder of a tenants' rights activist (the activist's body was found dismembered, and Ferranti allegedly later claimed credit for mutilating the corpse).

Our search has revealed no case where we have found that a district court clearly erred when it decided to release a defendant on bail in circumstances analogous to those here. *See Mercedes*, 254 F.3d at 436-38 (holding that district court clearly erred in granting defendants' pretrial release where defendants were charged with conspiracy to commit armed robbery and possession of a weapon in connection with that offense and where the government proffered evidence that

one of the defendants had twice been convicted of possession of a weapon and had previously violated the conditions of a prior release, another defendant had a history of domestic violence, and the final defendant was not a U.S. citizen and was released on a $200,000 bond secured by only a $5,000 cash deposit and therefore was a flight risk); *United States v. Jimenez*, 104 F.3d 354 (2d Cir. 1996) (reversing the order of the district court releasing defendant from pretrial detention where the defendant was previously convicted of criminal sale of a controlled substance, indicted for conspiracy to murder in aid of racketeering activity and attempted murder in aid of racketeering, and the government presented evidence that the defendant was a member of a violent criminal organization); *United States v. Millan*, 4 F.3d 1038, 1046-47, 1049 (2d Cir. 1993) (reversing the order of the district court releasing defendants from pretrial detention where both defendants presented a high risk of flight and where one of the defendants had multiple prior convictions, including criminally negligent homicide for shooting his wife, and the other defendant had allegedly "ordered numerous shootings, beatings, and a contract murder, and had issued threats against the families of witnesses who testified adversely to him at trial"); *United States v. Dono*, 275 F. App'x 35, 37 (2d Cir. 2008) (summary order) (holding that the

26

district court clearly erred in granting the release of defendants from pretrial detention where the defendants were charged with assault and where the government proffered evidence that the defendants were alleged members of an organized crime family, had violently beat two individuals (including "attempting to or actually putting the barrel of a handgun in a victim's mouth"), and had threatened future physical harm to the victims and their families).

In light of the above, while we would not necessarily have reached the same conclusion as the judges below, we cannot say that the district court committed clear error. The conditions of release contain provisions that impede defendants' ability to engage in criminal activity, and the evidence to which the government points us and which we have otherwise gleaned from the record is inadequate to leave us with a firm conviction that the district court erred in finding those conditions sufficient to assure public safety.

\* \* \*

For the foregoing reasons, we AFFIRM the order of the district court and VACATE the stay previously entered in this matter.

Jon O. Newman, Circuit Judge, dissenting:

On the night of May 29 in Brooklyn, Appellee Urooj Rahman got out of a car driven by Appellee Colinford Mattis, lit an explosive device known as a Molotov cocktail, and tossed it through the broken window of an unoccupied police car, setting the console on fire. Parked where people were nearby, she attempted to distribute bombs to a bystander and others for their use. She then left the scene in Mattis's car, which contained one completed bomb and components for making more bombs. Their thinking was expressed by Rahman on a videotape, about an hour before the crime: "The only way they hear us is through violence." The majority's decision to affirm the release of these Appellees from pretrial detention subjects the community to an unacceptable risk of danger. I respectfully dissent.

1. Clear Error

The Appellees were arrested for bombing a New York City police department vehicle during a protest sparked by the death of George Floyd, an African-American who died after a Minneapolis police officer placed his knee on Floyd's neck for several minutes. A Magistrate Judge found, and a District Judge agreed on review, that the conditions of bail release proposed by the Defendants would "reasonably assure . . . the safety of . . . the community." 18 U.S.C. § 3142(e)(1). That finding is reviewed for "clear

error," *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995),[1] which the Supreme Court

has instructed occurs when a reviewing court has "'the definite and firm conviction that

a mistake has been committed,'" *Anderson v. Bessemer City*, 470 U.S. 564, 793 (1985)

---

[1] I accept *Ferranti* as binding precedent of this Circuit that a District Court's determination that the conditions of the pretrial release of a defendant will reasonably assure the safety of the community is reviewed for clear error, but pause to observe that this standard of review is subject to some doubt. The distinction between a finding of fact, reviewed for clear error, and a ruling on a point of law, reviewed *de novo*, sometimes requires careful consideration. *See Antilles Steamship Co. v. Members of the American Hull Insurance Syndicate*, 733 F.2d 195, 202 (2d Cir. 1984) (Newman, J., concurring). That the determination concerns a prediction about the future does not insulate it from clear error review. *See, e.g.*, *In re Jackson*, 593 F.3d 171, 178 (2d Cir. 2010) (finding of future earnings); *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 529 (2d Cir. 2004) (finding of future viability of a business).

Clear error review, at least in some contexts, applies not only to what will occur in the future but also the degree of likelihood that something will occur. *See Hui Lin Huang v. Holder*, 677 F.3d 130, 134 (2d Cir. 2012) (Immigration Judge's finding of likelihood of future persecution for purposes of an asylum claim reviewed for clear error by Board of Immigration Appeals); *En Hui Huang v. Attorney General*, 620 F.3d 372, 382-83 (3d Cir. 2010) (same).

A determination that conditions of pretrial release will reasonably assure the safety of the community, or a reciprocal determination that such conditions will not reasonably protect the community from danger, involves three components. The first concerns the reasonableness of the requisite assurance of safety or risk of danger. Determining reasonableness is usually a legal determination for a court, *see, e.g.*, *Maryland v. King*, 569 U.S. 435, 448 (2013) (reasonableness of scope and manner of execution of warrantless search); *Lore v. City of Syracuse*, 670 F.3d 127, 161 (2d Cir. 2012) (reasonableness of public official's belief that action was lawful), although the reasonableness of an alleged tortfeasor's conduct is regularly submitted to a jury as if it were a factual issue. The second is the likelihood that safety will be protected or that danger will ensue. The third is the extent of safety that the community is entitled to enjoy or the extent of danger from which the community is entitled to be protected. The safety need not be guaranteed, but the danger must be more than trivial.

In the asylum context, "persecution," unlike safety or danger, has a well developed meaning, *see Ivanishvili v. U.S. DOJ*, 433 F.3d 332, 341 (2d Cir. 2006) (persecution is "infliction of suffering or harm upon those who differ on the basis of a protected statutory ground"), so an Immigration Judge's fact-finding concerns only whether it will occur and how likely is its occurrence. However, the combination of the three components of the bail release determination, especially the one concerning reasonableness, makes that determination arguably an issue of law, or perhaps the application of a legal standard--reasonable assurance of community safety--to the fact of what will happen and the likelihood of its happening. Perhaps that is why *Ferranti* called the determination "a mixed question of fact and law," 66 F.3d at 542, to which, in other contexts, the standard of review depends on whether "answering it entails primarily legal or factual work." *U.S. Bank National Ass'n v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).

(quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).[2] I have that definite and firm conviction. Here's why:

A judicial officer must detain an arrested person before trial if the officer finds "that no . . . combination of conditions will reasonably assure . . . the safety of . . . the community." 18 U.S.C. § 3142(e)(1). The facts to support such a finding must be supported by "by clear and convincing evidence." *Id*. § 3142(f)(2)(B). In determining whether conditions of release will reasonably assure the safety of the community, the judicial officer is required to consider four factors: the "nature and circumstances of the offense" including whether it involves an "explosive" or "destructive device," *id*. § 3142(g)(1), "the weight of the evidence," *id*. § 3142(g)(2), "the history and characteristics of the person," *id*. § 3142(g)(3), and "the nature and seriousness of the danger to . . . the community that would be posed by the person's release," *id*. § 3142(g)(4). Only the third factor favors these Appellees;[3] the first, second, and fourth factors strongly support detention.

---

[2] This appeal differs from review of the many cases where a bench trial judge, or a judge hearing a pretrial matter, has made findings of fact after hearing witnesses and assessing their credibility. In such cases, we are properly cautious in reviewing for clear error on a cold record. In this case, there were no witnesses at the hearings before the Magistrate Judge or the District Judge, there was no issue of credibility, and the Appellees did not contest, at this stage of the case, the facts presented by the Government, notably the facts of their conduct, which are shown on videotape and a photograph.

[3] An amicus curiae brief filed by a group of able lawyers, identifying themselves as "Former Federal Prosecutors," many of whom are also current defense lawyers, contends that the Government improperly urged the judicial officers to disregard the commendably favorable aspects of the Appellees' backgrounds because those aspects existed before the charged offenses. Br. for Amicus Curiae at 4-6. The brief has been joined by The National Association of Defense Lawyers. The amicis' argument overstates the Government's contention. Rather than argue that the Appellees' backgrounds should be disregarded, the Government legitimately contended that in this case, those backgrounds, which obviously existed prior to the charged

Preliminarily, I note that the motions panel, which stayed the release order pending a ruling by the merits panel, pointedly noted that the stay factors to be considered "most critically" were "the likelihood of success and irreparable injury to the movant absent a stay." *United States v. Mattis*, No. 20-1713 (2d Cir. June 5, 2020) (order granting stay pending appeal). Because the injury to the Appellees from granting a stay, their return to custody, was irreparable, the motions panel, viewing the same record now before this merits panel, obviously thought the Government had shown not only a likelihood of success, but a likelihood sufficiently substantial to outweigh the Appellees' injury. Although that panel's interim assessment of the merits is not binding on this panel, *cf. United States v. Belbacha*, 520 F.3d 452 (D.C. Cir. 2007) (denial of preliminary relief not law of the case), it gives me a significant reason to believe that my dissenting view is correct.

The crime in this case was no "spur of the moment" action, as might occur, for example, if marching in the protest, either of the Appellees had seen a Molotov cocktail accidentally dropped on the sidewalk, picked it up, and, without careful thought, immediately threw it into a police car. Such a serious act, though wrongful, might be said

---

offenses, did not deter the Appellees and would not "provide moral suasion against future criminal conduct," Br. for Appellant at 12. The Government acknowledged that the Appellees' backgrounds "are certainly relevant to the analysis" of the bail release factors requiring consideration, *id*. at 19, but contended that their familial relationships "do not rebut the statutory presumption that they pose a danger to the community," Reply Br. for Appellant at 12.

to be a momentary lapse of judgment on the part of someone emotionally caught up in the outrage over the event that provoked the protest.

But Rahman's act, assisted by Mattis, was carried out after deliberation, planning, and procurement of bomb components, occurring in an interval of at least one hour. Around midnight, she was videotaped walking out of a neighborhood convenience store where she reportedly purchased supplies,[4] and around 1 a.m. she was videotaped throwing the lighted bomb. Although her target was property, people nearby were put at risk. She also compounded her wrongdoing by offering bombs to others, whose targets she could anticipate might well have been bystanders. And the presence of one assembled bomb and bomb components in the car, including a can of gasoline, show that she and Mattis were prepared to continue their criminal conduct.

Rahman and Mattis are both lawyers, age 31 and 32, respectively. Their counsel contended that their actions were aberrant, and that the chances of their doing a similar act again is unimaginable. In my view, it was unimaginable, before the event, that they would have acted as they did. But we now know that they were susceptible to being provoked to take seriously dangerous actions that night, and they remain a risk to being provoked again to take additional dangerous actions.

---

[4] *See* Nicole Hong & William K. Rashbaum, *The 2 Lawyers, the Anti-Police Protests and the Molotov Cocktail Attack*, N.Y. Times, June 7, 2020.

I do not contend that it is certain they will act dangerously if released. I do not even say it is highly likely. I do say that the risk of their doing so is unacceptable, a risk no community should be asked to bear. That risk creates a danger to the community.

Their lawyers argue that two circumstances render the risk of their future dangerous conduct insufficient to warrant pretrial detention. The first is the shock they experienced by being arrested and placed briefly in jail. The second is the inhibiting effect of awareness that any criminal conduct would be a breach of their bond, subjecting their families to severe financial hardship.

These circumstances might somewhat reduce the risk of a future act of violence. But these Appellees have shown that the prospect of serious adverse consequences like the end of their legal careers, in addition to a substantial prison term, did not deter them from taking dangerous action about which they had ample time to deliberate. I have little doubt that, while sitting in jail the past few weeks, they believe they will not take dangerous action again. The issue, however, is whether there is an unacceptable risk that, despite their likely current state of mind, some future event will again stir their outrage and provoke them to take action that risks injury and perhaps even death to members of the community.

As for the bond conditions, our Court has at least twice ruled that, although bonds secured by family members and other sureties sufficed to deter flight, they did not assure the safety of the community. *See United States v. Mercedes*, 254 F.3d 433, 436-37 (2d Cir.

2001)[5]; *United States v. Rodriguez*, 950 F.2d 85, 89 (2d Cir. 1991). Lawyers willing to risk an

end to their legal careers are not likely to be deterred from dangerous action by financial

loss to family and friends resulting from violation of their bonds.[6] And we have noted

that electronic monitoring devices "can be circumvented" and "rendered inoperative."

*United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993).

2. The Statutory Presumption

Federal law provides that when, as in this case, a judicial officer finds probable

cause to believe that a person violated any of a group of statutes including 18 U.S.C.

§ 844(i), "it shall be presumed" that "no . . . combination of conditions will reasonably

assure . . . the safety of the community." *See* 18 U.S.C. § 3142(e)(3)(C).[7] That presumption

"reflects Congress's substantive judgment that particular classes of offenders should

ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir.

---

[5] In *Mercedes*, one of the defendants this Court returned to jail, like the Appellees, had no criminal record, was employed, and had strong tries to his sureties. 254 F.3d at 437.

[6] The majority sees a "heads I win, tails you lose" analysis "[i]f now a defendant's life history and characteristics can support detention, on the one hand, because that history demonstrates the defendant engaged in bad acts, and, on the other hand, because the history is so spotless and impressive that the defendant should have 'known better.'" Maj. Op. at 21-22. But the life history of these Appellees is not what "demonstrates" that either had "engaged in bad acts." Their conduct on the night of May 29 demonstrates their bad acts. And their impressive history is not what creates the risk of future dangerous activity; it is their willingness to risk their legal careers that provides a considerable basis to apprehend future misconduct upon provocation.

[7] The full text reads:

"Subject to rebuttal by the person, it shall be presumed that no condition or combination of circumstances will reasonably assure . . . the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed."

18 U.S.C. § 3142(e)(3)(C). One of the offenses listed in subsection 2332b(g)(5)(B) is 18 U.S.C. § 844(i), with which the Appellees are charged.

2010). It "represents Congressional findings that certain offenders . . . are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

The presumption is subject to rebuttal, placing on a defendant a burden of production to "com[e] forward with evidence that he does not pose a danger to the community." *See Mercedes*, 254 F.3d at 436. Even if the Appellees' conditions of bail release satisfied their burden of production, we have ruled that "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Id*. at 436; *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986).[8]

Although neither judicial officer in this case mentioned this presumption in their decisions, it is reasonable to assume that they were aware of a statutory provision applicable to the case before them, which the Government had called to their attention. Their bail release rulings may be considered an implicit finding that the Appellees had

---

[8] Considering the risk of flight, to which the statutory presumption also applies in certain circumstances, in addition to risk of danger to the community, this Court has instructed that "[a] judicial officer conducting a detention hearing should, even after a defendant has come forward with rebuttal evidence, continue to give the presumption of flight some weight by keeping in mind that Congress has found that these offenders pose special risks of flight, and that 'a strong probability arises' that no form of conditional release will be adequate to secure their appearance." *Martir*, 782 F.2d at 1144 (quoting S. Rep. No. 225 at 19, 98th Cong., 1st Sess. (1984).

satisfied their burden of production, although an explicit finding to that effect would have been helpful. *See id.* (trial judge "should have made more detailed findings").

But it is not reasonable to assume that the judicial officers were familiar with the entirety of Second Circuit case law or even decisions of this Court like *Mercedes* applicable to their task in this case. No particular words needed to be expressed or written, but some explicit indication was required, not to acknowledge the existence of the presumption, but to show awareness of, and compliance with, the obligation required by this Court to "consider" the rebutted presumption among the factors to be "weighed" in determining whether release of the Appellees would pose a danger to the community. *Mercedes*, 254 F.3d at 436.[9] Although the judicial officers explicitly referred to the four statutory factors of 18 U.S.C. § 3142(g), outlined above, required to be considered in determining whether a defendant's release will pose a danger to the community, there is no indication that they "weighed" the presumption among these statutory factors. Even if we do not reverse for clear error, we should remand to oblige the District Court to comply with its *Mercedes* obligation.

---

[9] The bail statute requires written findings of fact for a detention order, *see* 18 U.S.C. § 3142(i), but imposes no similar requirement for a release order, *id.* § 3142(h), as this Court has noted. *See United States v. Chimurenga*, 760 F.2d 400, 406 (2d Cir. 2017). But the judicially created obligation in *Mercedes* has nothing to do with findings of fact, and proper appellate review is best achieved when judicial officers provide at least some indication that they have complied with this requirement.