22-2745-cv
*Jeffery v. City of New York*

# In the
# United States Court of Appeals
# for the Second Circuit

_____

AUGUST TERM 2023

No. 22-2745-cv

LAMEL JEFFERY, THADDEUS BLAKE, AND CHAYSE PENA,

*Plaintiffs-Appellants*,

v.

CITY OF NEW YORK; ERIC ADAMS, in his official capacity as Mayor of the City of New York; BILL DE BLASIO, in his individual capacity; and ANDREW CUOMO, in his individual capacity,

*Defendants-Appellees*.[*]

_____

SUBMITTED: SEPTEMBER 14, 2023

DECIDED: AUGUST 16, 2024

_____

Before: RAGGI, LOHIER, and CARNEY, *Circuit Judges*.

_____

Plaintiffs appeal from a judgment of the United States District Court for the Eastern District of New York (Garaufis, *J.*) dismissing this § 1983 putative class action for money damages sustained when, in June 2020, plaintiffs were arrested for violating a week-long nighttime curfew imposed by New York City in response to violence and destruction attending demonstrations protesting the death of

_____

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

George Floyd at the hands of Minneapolis police. Plaintiffs submit that the curfew violated rights protected by the First, Fourth, and Fourteenth Amendments to the Constitution, particularly, the right to travel, which this court has recognized to apply intrastate. They submit that the district court correctly determined that the curfew had to withstand strict scrutiny to survive their right-to-travel challenge, but erred in concluding at the pleadings stage that the curfew withstood such scrutiny. Assuming that strict scrutiny applies to the challenged curfew, dismissal was warranted because the pleadings, considered together with judicially noticeable facts, demonstrate that the curfew (1) served a compelling governmental interest in curbing escalating crime and restoring public order and (2) was narrowly tailored to that interest, thereby precluding plaintiffs from stating a plausible right-to-travel claim. *See* Fed. R. Civ. P. 12(b)(6).

AFFIRMED.

_____

Joshua P. Fitch, Cohen & Fitch LLP, New York, NY, *for Plaintiffs-Appellants*.

Jesse A. Townsend (Sylvia O. Hinds-Radix, Corporation Counsel, Richard Dearing, Rebecca L. Visgaitis, *on the brief*), *for* City of New York; Eric Adams, in his official capacity; and Bill de Blasio, in his individual capacity, *Defendants-Appellees*.

Nicole Gueron, Clarick Gueron Reisbaum LLP, New York, NY, *for* Andrew Cuomo, in his individual capacity, *Defendant-Appellee*.

_____

REENA RAGGI, *Circuit Judge*:

At issue on this appeal is a constitutional challenge to a nighttime curfew imposed throughout New York City ("City") for the one-week period between June 1 and June 7, 2020, in response to violence and destruction attending certain public demonstrations protesting the May 25, 2020 death of George Floyd at the hands of Minneapolis police ("Floyd demonstrations"). At the time, City residents were already subject to various restrictions imposed to control the spread of the COVID-19 virus, including a 10-person limit on public gatherings.[1] Plaintiffs Lamel Jeffery, Thaddeus Blake, and Chayse Pena were each arrested for violating the challenged curfew in circumstances unrelated to the referenced Floyd demonstrations or the COVID-19 limitations. In this action filed in the Eastern District of New York (Nicholas G. Garaufis, *Judge*), plaintiffs sued the City; former City Mayor Bill de Blasio; former New York State Governor Andrew Cuomo; and 50 unnamed City police officers, seeking a declaration that the curfew, on its face, violated their constitutional rights to travel, to assemble, to be free from unlawful arrest, and to equal protection of law, as secured by the First, Fourth, and Fourteenth Amendments to the Constitution. Pursuant to 42 U.S.C. § 1983, plaintiffs also seek money damages from these defendants for their constitutional violations.

Plaintiffs now appeal from so much of a final judgment entered in the district court on September 23, 2022, as dismissed their right-to-travel challenge for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). Plaintiffs maintain that the district court correctly determined that a right-to-travel challenge to a curfew triggers strict scrutiny, but they argue that the court erred in concluding as a matter of law at the pleadings stage that the challenged curfew here withstands

---

[1] *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 8.202.33 (2020) (May 22, 2020 state order prohibiting non-essential gatherings of more than ten individuals); City of N.Y., Emergency Exec. Order No. 115 (May 24, 2020 City order authorizing same).

3

such scrutiny.  Assuming that strict scrutiny is the appropriate standard for review of plaintiffs' right-to-travel challenge, we conclude that dismissal was warranted in this case.  Even when viewed "in the light most favorable to plaintiffs," the facts alleged in plaintiffs' complaint, considered together with "all matters of proper judicial notice and public record," *Melendez v. City of New York*, 16 F.4th 992, 996–97 & n.2 (2d Cir. 2021), admit a single conclusion, *i.e.*, that the challenged curfew—implemented against the highly unusual and well-documented confluence of a deadly global pandemic and nationwide Floyd demonstrations—(1) served compelling governmental interests in curbing escalating crime and restoring public order, and (2) was narrowly tailored to those interests.  *See Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (stating strict scrutiny standard).  Accordingly, we affirm the challenged judgment of dismissal.

## BACKGROUND

I.     **City Demonstrations and Criminal Activity Following the Death of George Floyd**

On May 25, 2020, Minneapolis police officers arrested George Floyd, a 46-year-old African-American man, for allegedly buying cigarettes with a counterfeit $20 bill.  This court has recognized that "[w]hat happened next," both in Minneapolis and across the nation, "is now well known":

> When Floyd resisted sitting in the back seat of the police squad car, saying he was claustrophobic, three officers pinned him face-down on the ground.  A white officer knelt on Floyd's neck for nearly ten minutes while Floyd repeatedly said he could not breathe.  Floyd was pronounced dead that night, and video of his encounter with the police went viral, sparking major protests against police brutality and racism in Minneapolis and around the country.

*Connecticut State Police Union v. Rovella*, 36 F.4th 54, 59 (2d Cir. 2022).

As plaintiffs acknowledge, in the City, such protests involved thousands of persons and spanned all five boroughs: "[B]eginning on May 28, 2020, thousands

4

of marchers, protestors, and demonstrators began gathering in various sections of the five boroughs to protest police brutality against Black and minority communities." Compl. ¶ 11. Plaintiffs allege that the vast majority of demonstrators were "peaceful," *id.* ¶ 13, a point that defendants do not dispute, *see* City Appellees' Br. at 6. Nevertheless, as plaintiffs further acknowledge, there were "tumultuous and confrontational moments in some areas in the City," *id.* ¶ 14, and "severe instances of criminal behavior," *id.* ¶ 46, including "looting, destruction of property, and violence by a small number of individuals," *id.* ¶ 14. To illustrate, the complaint references "reports" of "property destruction, vandalism, and looting" in the Bronx along Fordham Road; in Manhattan along Sixth Avenue, in Herald Square, in the Diamond District, and in SoHo; and in Brooklyn near the Barclays Center and outside three police precincts. *Id.* ¶ 16.

While the Complaint does not identify the specific "reports" referenced, it is apparent that it alludes to contemporaneous news reports. In considering such reports, we are mindful that a court must exercise "caution" in identifying facts contained therein as sufficiently "beyond controversy" to warrant judicial notice for the truth of what they state. *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998). That is particularly so on a Rule 12(b)(6) motion for dismissal, where plaintiffs lack an opportunity for discovery or an evidentiary hearing. *See, e.g.*, *Melendez v. City of New York*, 16 F.4th at 997 n.2 (collecting cases); *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020); *Oneida Indian Nation of N.Y. v. State of New York*, 691 F.2d 1070, 1086 (2d Cir. 1982).

Thus, at the outset, we note that our judicial notice of facts reported by the media is here limited as follows. We take judicial notice of media reports insofar as they detail widely documented events that plaintiffs themselves reference or generally acknowledge in their pleadings. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149 n.1 (2d Cir. 2012) (stating that this court assumes plaintiffs' allegations to be true "unless conclusory or contradicted by

5

more specific allegations or documentary evidence"); *see generally Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (declining to credit plaintiff's "attenuated allegations" insofar as they "are contradicted both by more specific allegations in the Complaint and by facts of which we may take judicial notice"). We also take notice of news reports insofar as they demonstrate the sort of information available to City officials at the time of the challenged curfew. *Cf. United States v. Nieves*, 58 F.4th 623, 633–34 (2d Cir. 2023) (taking judicial notice of news articles, not for truth, but to assess how to probe venire for potential bias in light of news coverage). Finally, we take notice that media reports of violence and destruction in the City at the time here at issue were not episodic but, rather, pervasive, largely consistent with one another in their factual accounts of specific events, and subsequently confirmed in a detailed public report of the City's Department of Investigation ("DOI").[2] Given the highly unusual confluence of a global pandemic and nationwide Floyd demonstrations, these limiting circumstances combine to allow us to conclude that the media reports referenced herein were sufficiently widely publicized and documented to reflect "facts generally known" within the City at the relevant time.[3] *Williams v. New York City*

---

[2] *See* New York City Dep't of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (Dec. 2020) ("DOI Report"), nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf [perma.cc/4HJG-2BFC]. The DOI is "the City's independent inspector general," *DOI's Mission and History*, nyc.gov/site/doi/about/mission.page [perma.cc/5H99-WLAN], broadly authorized by law "to make any study or investigation" which it deems "in the best interests of the city, including but not limited to investigations of the affairs, functions, accounts, methods, personnel or efficiency of any agency," N.Y.C. CHARTER § 803(b). Every City officer or employee must provide "[f]ull cooperation" to DOI, at risk of suspension or termination. *Id.* § 1128(a) & (b). *See also In re Dep't of Investigation of City of New York*, 856 F.2d 481, 482 (2d Cir. 1988) (describing DOI's authority to issue compulsory process); Rose Gill Hearn, *Integrity and the Department of Investigation*, 72 FORDHAM L. REV. 415, 416–18 (2003) (describing measures to ensure DOI's independence).

[3] Between May 29 and June 8, 2020, virtually every established news outlet reported daily on City demonstrations triggered by George Floyd's death, as well as on attending criminal activity. The following citations are illustrative, but the list is far from exhaustive:

*Hous. Auth.*, 61 F.4th 55, 61 n.2 (2d Cir. 2023) (internal quotation marks omitted); *see also Nationalist Movement v. City of Cumming*, 913 F.2d 885, 893 (11th Cir. 1990) (holding that court permissibly took judicial notice of violence sometimes attending plaintiff's rallies because (1) rallies "had been the subject of national media publicity and attention," (2) court's observations "were apparently based on local and national media accounts, as well as on public records," and (3) relevant facts "were generally known within" local geographic area).[4]

As for the DOI Report, here too, we take judicial notice only insofar as it

---

Jim Mustian, *Chaos and destruction as New York City protest turns violent*, ASSOCIATED PRESS (May 30, 2020) ("AP, May 30, 2020"), apnews.com/article/a786e36787da75082b3f9893b2129a0e [perma.cc/E9A9-QN2B];

Alan Feuer & Azi Paybarah, *Thousands Protest in N.Y.C., Clashing With Police Across All 5 Boroughs*, N.Y. TIMES (May 30, 2020) ("NYTimes, May 30, 2020"), nytimes.com/2020/05/30/nyregion/protests-nyc-george-floyd.html [perma.cc/8P6B-DRRK];

*N.Y.C. Protests Turn Violent*, N.Y. TIMES (May 31, 2020) ("NYTimes, May 31, 2020"), nytimes.com/2020/05/31/nyregion/nyc-protests-george-floyd.html [perma.cc/D7AZ-NB6N];

Arian Campo-Flores et al., *Anger and Unrest Sweep Across U.S.*, WALL ST. J. (June 1, 2020) ("WSJ, June 1, 2020"), wsj.com/articles/george-floyd-protests-minneapolis-11590844180 [perma.cc/X345-PCWM];

Michael Herzenberg et al., *We Were Out Covering Protests in NYC This Weekend. This Is What We Saw*, SPECTRUM NEWS NY1 (June 2, 2020) ("NY1, June 2, 2020"), ny1.com/nyc/all-boroughs/news/2020/06/01/reporter-ron-lee-on-protest-coverage-in-new-york-city [perma.cc/CDX2-229A].

In the absence of such pervasiveness and consistency across many reports (or some other indicia of unquestioned accuracy), *see Williams v. New York City Hous. Auth.*, 61 F.4th 55, 61 n.2 (2d Cir. 2023), news reports will likely not warrant such notice.

Insofar as plaintiffs dismiss media coverage as "sensationalistic," Compl. ¶ 30, we decline to credit that conclusory characterization. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding court need not credit "mere conclusory statements" in complaint). Instead, we take notice of news reports only as just indicated in text.

[4] The Eleventh Circuit's opinion was initially vacated after that court voted to rehear the case *en banc*, *see* 921 F.2d 1125 (11th Cir. 1990) (mem.), but the *en banc* court subsequently reinstated the panel's decision, *see* 934 F.2d 1482 (11th Cir. 1991) (*en banc*). The Supreme Court affirmed the Eleventh Circuit without discussion of judicial notice. *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992).

(1) details events generally acknowledged by plaintiffs, and (2) contains confirming New York Police Department ("NYPD") statistical data on which plaintiffs themselves sometimes rely in their pleadings. *See* Compl. ¶¶ 32–35, 54–57, 59 (relying on NYPD statistics to compare number of arrests before and during curfew period); DOI Report at 9 n.6 (describing DOI's compilation of NYPD arrest statistics for relevant period). We do not notice that report for its interpretation of events or its assessment of the efficacy of the City's response to events.

Thus, consistent with these parameters and plaintiffs' own acknowledgment that violence, destruction, and looting sometimes attended Floyd demonstrations in various City locations, we take notice of reports detailing such conduct. For example, plaintiffs acknowledge reported destruction, vandalism, and looting at Brooklyn's Barclays Center and outside three Brooklyn police precincts. *See* Compl. ¶ 16. News accounts from the night of May 29 report that an "initially peaceful demonstration" outside the Barclays Center "spiraled into chaos . . . as protestors skirmished with police officers, destroyed police vehicles and set fires." AP, May 30, 2020 (reporting protesters pelting police with water bottles and police spraying eye-irritating chemical into crowd multiple times); *see id.* (reporting worsening situation later in evening with certain demonstrators setting fire to one police vehicle while others battered another police vehicle with a club; meanwhile, at nearby location, protesters wearing helmets and carrying makeshift shields threw objects while advancing on police who responded with batons and arrests); *accord* NYTimes, May 30, 2020 (noting that on May 29, "violent protests erupted outside Barclays Center in Brooklyn, where some in the crowd had hurled bottles and firebombs at the police").[5]

---

[5] Police use of force during the City's Floyd demonstrations is a matter of ongoing litigation in this circuit. *See, e.g., In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 795 (2d Cir. 2022) (reversing denial of police union's motion to intervene in litigation challenging "police actions and practices in response to demonstrations that occurred in the summer of 2020"); *In re New York City Policing*

The DOI Report confirms these accounts and provides particulars. It states that, on Friday night, May 29, a crowd of approximately 3,000 people gathered outside the Barclays Center. DOI Report at 10. "Video [of that gathering] posted to social media captured some of the violent clashes between police and protesters, including images of police officers shoving or striking protesters, police vehicles set on fire, and two separate incidents where individuals struck NYPD vehicles with incendiary devices." *Id.* Meanwhile, around 9:00 p.m. that same night, a "volatile confrontation with police officers" occurred outside Brooklyn's 88th police precinct, resulting in 20 arrests and five officer injuries. *Id.* Another confrontation took place around 10:00 p.m. outside Brooklyn's 79th precinct, resulting in "six additional arrests, including one person armed with a loaded handgun." *Id.* NYPD statistics reported more than 200 arrests related to the protests were logged on May 29, while 59 officers were reported injured and 37 police vehicles damaged. DOI Report at 10.

News accounts of events the following day, May 30, reported "[t]housands of demonstrators" again taking to City streets, "blocking traffic, setting fire to police vehicles and clashing with officers at simultaneous marches that raged through all five boroughs." NYTimes, May 30, 2020. Floyd demonstrations that day were reported "through Harlem, the East Village, Times Square, Columbus Circle, Jackson Heights in Queens, the Flatbush section of Brooklyn and portions of the Bronx and Staten Island." *Id.* News reports recounted that "[m]any of the[se] actions were peaceful," but that some protests became violent "at intervals," with people "overturn[ing] trash cans, smash[ing] store windows, set[ting] fire to police cars, and hurl[ing] bottles and other debris at crowds of officers," who sometimes used batons on protesters or drove police cars forward into crowds of protesters. *Id.* The DOI Report, in detailing events of May 30,

*During Summer 2020 Demonstrations*, No. 20-cv-08924-CM (S.D.N.Y.) (litigation in district court). We, therefore, express no view as to such conduct at this time.

confirmed blocked traffic on the FDR Drive, the West Side Highway, and the Manhattan Bridge, police vehicles set on fire, and police use of force against protesters. DOI Report at 11–13. On May 30, NYPD statistics reported nearly 350 arrests, 91 officers injured, and 55 police vehicles damaged. *See id.* at 13.

In one well-known incident from the early morning hours of May 30—well known because it found its way into federal court—two licensed attorneys were arrested—and subsequently convicted—for attempting to distribute Molotov cocktails to protesters, with one of the attorneys throwing a Molotov cocktail into an unoccupied police vehicle. *See United States v. Mattis*, 963 F.3d 285, 287 (2d Cir. 2020); *id.* at 296 (Newman, *J.*, dissenting) (detailing defendants' actions, some captured on videotape, in concluding that their release on bail "subjects the community to an unacceptable risk of danger"); William K. Rashbaum & Andrea Salcedo, *Two Lawyers Arrested in Molotov Cocktail Attack on Police in Brooklyn*, N.Y. TIMES (May 31, 2020), nytimes.com/2020/05/31/nyregion/nyc-protests-lawyer-molotov-cocktail.html [perma.cc/K6B4-BUH4].

News reports indicated that other cities, also experiencing criminal activity in conjunction with Floyd demonstrations, imposed curfews and/or deployed the National Guard. *See* Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, N.Y. TIMES (Nov. 5, 2021), nytimes.com/article/george-floyd-protests-timeline.html [perma.cc/BV6C-NP4F] (noting that on May 31, 2020, "National Guard was deployed in more than two dozen states to assist overwhelmed police departments, and dozens of mayors extended curfews"). At that time, however, Mayor de Blasio stated that "he would not issue a curfew" in the City, "citing the effectiveness of the police department and what he characterized as a small number of protesters for a city of 8 million people." NYTimes, May 30, 2020. Plaintiffs appear to agree with this assessment, maintaining that no different conclusion was later warranted.

10

Contemporaneous news reports, however, indicated worsening conditions the next night, Sunday, May 31, with "jarring scenes of flaming debris, stampedes and looted storefronts." NYTimes, May 31, 2020 (describing "[f]lames nearly two stories high" leaping from trash cans set afire in vicinity of Manhattan's Union Square at approximately 10:00 p.m.). "As the night wore on, violent confrontations between protestors and police officers erupted throughout Manhattan and Brooklyn," with protesters throwing "glass bottles and trash at the police, while large groups of officers charged down streets, pushing crowds of demonstrators aside and using batons as they made arrests." *Id.* Looting also became more prevalent: "Much of SoHo, the East Village, and Flatiron neighborhoods in Manhattan was ransacked as people filled garbage bags with shoes, clothes and other goods, and shouted to each other which store would be next." *Id.* A group heading up Manhattan's Fifth Avenue "began smashing telephone booths, bus kiosks, CitiBike terminals and storefronts." *Id.*

The DOI subsequently confirmed this escalating violence and destruction on May 31, noting the deployment of larger numbers of police officers to Midtown and Lower Manhattan after 11:20 p.m. "to prevent further looting and commercial break-ins." DOI Report at 14. That violence included shots being fired around 11:38 p.m. in Queens at a police officer sitting inside a marked police vehicle, resulting in non-life-threatening injuries. *See id.* Shortly before 3:30 a.m., another "police officer was struck by a vehicle on West 8th Street in Manhattan." *Id.* DOI cites statistics indicating approximately 349 arrests logged, 34 police officers reported injured, and 13 police vehicles damaged on May 31. *See id.*

## II. The Challenged City Curfew

### A. Executive Order 117

It was only at this point that a curfew was imposed. As the Complaint alleges, on Monday, June 1, 2020, Mayor de Blasio and Governor Cuomo jointly announced the decision to address escalating violence and property damage in the

11

City by increasing police presence and "issuing a citywide Order" implementing a curfew. Compl. ¶ 17.[6]

To that end, the mayor signed Emergency Executive Order No. 117.[7] At the outset, that order notes that other executive orders from earlier in the year had already declared a state of emergency in the City "due to the [public health] threat posed by COVID-19," which threat was increased by "large gatherings" that facilitated "spread of the virus." Executive Order 117 at 1. The order then states that "peaceful demonstrations" had begun in the city in response to the death of George Floyd, but that such "demonstration activities were subsequently escalated, by some persons, to include actions of assault, vandalism, property damage, and/or looting." *Id.* Noting that such "violent acts have been happening primarily during the hours of darkness" when it is "especially difficult to preserve public safety," the order concludes that "the imposition of a curfew is necessary to protect the City and its residents from severe endangerment and harm to their health, safety, and property." *Id.* Accordingly, invoking authority conferred on the mayor by New York Executive Law § 24(1)(a),[8] as well as unspecified

---

[6] *See* City of New York, Mayor de Blasio and Governor Cuomo Announce Citywide Curfew in New York City Beginning at 11 PM Tonight (June 1, 2020), nyc.gov/office-of-the-mayor/news/394-20/mayor-de-blasio-governor-cuomo-citywide-curfew-new-york-city-beginning-11-pm [perma.cc/FG3S-FY9A].

[7] City of New York, Office of the Mayor, Emergency Executive Order No. 117 ("Executive Order 117") (June 1, 2020), nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-117.pdf [perma.cc/KZC7-8ZHW]. We may take judicial notice of executive orders. *See Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023).

[8] New York Executive Law § 24 states in pertinent part as follows:

1. Notwithstanding any inconsistent provision of law, general or special, in the event of a disaster, rioting, catastrophe, or similar public emergency within the territorial limits of any county, city, town or village, or in the event of reasonable apprehension of immediate danger thereof, and upon a finding by the chief executive thereof that the public safety is imperiled thereby, such chief executive may proclaim a local state of emergency within any part or all of the territorial limits of such local government. . . . Following such proclamation and during the continuance of such local state of emergency, the chief executive may promulgate local emergency orders to protect life and property or to bring

12

provisions of the City Charter, Administrative Code, and the common law, the order declares a state of emergency to exist within the City and imposes "a City-wide curfew from 11:00 p.m. on June 1, 2020 until 5:00 a.m. on June 2, 2020." *Id.* at 2. Pursuant to such curfew, "no persons or vehicles may be in public" except for "police officers, peace officers, firefighters, first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work, people experiencing homelessness and without access to a viable shelter, and individuals seeking medical treatment or medical supplies." *Id.* The order states that a failure to comply with the curfew will result in an order to disperse, and that a knowing violation of the curfew will constitute a class B misdemeanor. *See id.*; *see also* N.Y. PENAL LAW § 70.15(2) (punishing class B misdemeanors by up to three months' imprisonment).

## B. Executive Orders 118 and 119

Even before the initial order went into effect, reports of looting in multiple boroughs on the night of June 1 led Mayor de Blasio to conclude that a single night of curfew would be insufficient to restore order to the City. Accordingly, he ordered a second night of curfew from 8 p.m. on June 2 through 5 a.m. on June 3.[9] *See* Gloria Pazmino & Debora Fougere, *NYC Officially Under Curfew; Second Set for Tuesday Night, de Blasio Says*, SPECTRUM NEWS NY1 (June 1, 2020), ny1.com/nyc/all-boroughs/news/2020/06/01/new-york-city-curfew-protests [perma.cc/92SY-PAHT] (explaining that mayor decided on June 1 to extend curfew "after looting

---

the emergency situation under control. As illustration, such orders may, within any part or all of the territorial limits of such local government, provide for:

a. the establishment of a curfew and the prohibition and control of pedestrian and vehicular traffic, except essential emergency vehicles and personnel.

N.Y. EXEC. LAW § 24(1)(a).

[9] City of New York, Office of the Mayor, Emergency Executive Order No. 118 ("Executive Order 118") (June 1, 2020), nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-118.pdf [perma.cc/QGU4-PH7T].

was seen and reported in multiple boroughs in the evening"); *see also* Dana Rubinstein & Jeffery C. Mays, *Here's What Led to N.Y.C.'s First Curfew in 75 Years*, N.Y. TIMES (June 2, 2020), nytimes.com/2020/06/02/nyregion/curfew-new-york-city.html [perma.cc/6BSA-CVAZ] ("It was still a few hours before New York City would fall under a historic curfew on Monday night, but Mayor Bill de Blasio could already see that it was not working.").

The DOI confirmed that as the night of June 1 continued, the City experienced "a significant amount of violence, looting, and arrests," with NYPD statistics indicating approximately 2,300 commercial burglaries, 650 arrests, 73 police officers injured, and six police vehicles damaged. DOI Report at 15–16. Thus, on June 2, the mayor signed Executive Order No. 119, which extended the 8:00 p.m. to 5:00 a.m. curfew through June 8, 2020. *See* Compl. ¶ 19.[10] At a press conference announcing this extension, Mayor de Blasio reiterated his support for peaceful protesters, but stated that there had been "a lot of trouble in some parts of the city" the night of June 1 that was unacceptable, *e.g.*, "a small group of criminals attack[ing] their own neighborhood in the Bronx, tear[ing] down their own people"; other "people com[ing] to a swath of Midtown, Manhattan to attack luxury stores"; and "vicious," "purposeful" attacks on police officers. Press Conference Tr.[11] Thus, to "ensure . . . peace and order" in the City, he was extending the curfew. *Id.* The mayor expressed his intent "to work actively and

---

[10] City of New York, Office of the Mayor, Emergency Executive Order No. 119 ("Executive Order 119") (June 2, 2020), nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-119.pdf [perma.cc/XUJ5-66VD].

[11] *See* City of New York, Transcript: Mayor de Blasio Holds Media Availability ("Press Conference Tr.") (June 2, 2020), nyc.gov/office-of-the-mayor/news/397-20/transcript-mayor-de-blasio-holds-media-availability [perma.cc/CD9K-4GKH]. We do not consider the mayor's statements for their truth, but only for the fact that they were said, thus indicating defendants' contemporaneous rationale for extending the curfew. *See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) (stating that, in considering whether challenged policy was narrowly tailored, government justification cannot be "invented *post hoc*" (internal quotation marks omitted)).

strategically to stop any disorder," with the goal of ending the curfew on the morning of June 8. *Id.*

The expanded curfew did not immediately end violence and destruction in the City. Nevertheless, the City experienced a "notable decrease" in reports of "commercial burglaries and ATM robberies" on the night of June 2. DOI Report at 18. Total arrests also decreased modestly on June 2, to approximately 550, but with the majority related to violations of the curfew rather than more serious crimes. *See id.* The downward trend generally continued in the following days, with a "significant decrease in reported looting and vandalism" on June 3, a "continued decrease in reported looting and vandalism" on June 4, and still further declines in criminal activity on June 5 and 6. *Id.* at 19–22.

### C. Executive Order 122

On June 7, when "[l]argely peaceful gatherings were held throughout the day, and NYPD arrests for protest-related activity dropped dramatically," *id.* at 23, Mayor de Blasio signed Executive Order No. 122, which immediately terminated the emergency curfew one day ahead of its scheduled expiration. *See* Compl. ¶ 23 n.1.[12] At a press conference announcing that decision, the mayor stated that the City had now experienced "five days in a row . . . where we see peaceful protests predominating" and that "each day" had seen "a better and better situation" with "fewer and fewer arrests."[13]

---

[12] City of New York, Office of the Mayor, Emergency Executive Order No. 122 ("Executive Order 122") (June 7, 2020), nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-122.pdf [perma.cc/WH3P-8P6J].

[13] City of New York, Transcript: Mayor de Blasio Holds Media Availability (June 7, 2020), nyc.gov/office-of-the-mayor/news/413-20/transcript-mayor-de-blasio-holds-media-availability [perma.cc/Y6BN-2J6C].

15

### III. Plaintiffs' Arrests for Violating the Curfew

Plaintiffs are New Yorkers who were arrested for violating the challenged curfew in circumstances unrelated to the Floyd demonstrations. They do not allege that they had any special justification for violating the curfew; rather, they allege that the curfew was facially unconstitutional.

#### A. Lamel Jeffery

Lamel Jeffery alleges that he was arrested for violating the curfew on the evening of June 4, 2020, while attending an outdoor barbecue in Brooklyn. He asserts that, after police officers ordered him to go indoors, he "informed the officers that he would go home, which was around the corner." Compl. ¶ 101. As he began to walk home, however, "several NYPD officers aggressively stopped and tackled [him] and placed him in handcuffs despite having no probable cause to do so." *Id.* ¶ 102. Jeffery was taken into custody for approximately ten hours, after which he was released without charge.

#### B. Thaddeus Blake

Thaddeus Blake alleges that he was arrested around 8:45 p.m. on June 5. At that time, he was standing in front of his apartment building in the Bronx when police officers ordered him to go inside. Blake responded that he would do so once he retrieved his phone from an electrical outlet. Several police officers then allegedly "slamm[ed] him to the ground and aggressively handcuff[ed] him behind his back." *Id.* ¶ 108. Blake was taken into custody for approximately five hours, whereupon he was released with a criminal summons to return to court.

#### C. Chayse Pena

Chayse Pena alleges that he was arrested at approximately 10 p.m. on June 5 when he was driving around the Hell's Kitchen neighborhood of Manhattan looking for a parking spot. Police officers stopped him, ordered him out of his car, searched the vehicle, and then placed Pena "in restraints with his arms behind his

back." *Id.* ¶ 115. Pena was held in custody for approximately four hours, after which he was released with a criminal summons to return to court.

## IV. Dismissal of the Complaint

Approximately two weeks after the curfew ended, plaintiffs filed this putative class action in the Eastern District of New York suing the City, then-Mayor de Blasio in his official and individual capacities, then-Governor Cuomo in his official and individual capacities, and 50 unnamed "John Doe" police officers. The complaint seeks a declaration that the challenged curfew, on its face, violates rights secured by the First, Fourth, and Fourteenth Amendments to the Constitution, including the right to travel, and it seeks money damages pursuant to 42 U.S.C. § 1983. Present Mayor Eric Adams has been substituted for former Mayor de Blasio in claims against the latter in his official capacity. *See* Fed. R. Civ. P. 25(d) (providing for automatic substitution of public officer's successor for official-capacity claims). Meanwhile, the parties have stipulated to the dismissal of claims against Governor Cuomo in his official capacity.

Before certification of any class, defendants moved for dismissal of all of the named plaintiffs' claims except those for "selective enforcement and municipal liability." *Jeffery v. City of New York*, No. 20-CV-2843 (NGG) (RML), 2022 WL 204233, at *4 n.3, *8 (E.D.N.Y. Jan. 24, 2022).[14] The district court granted the motion as to all claims at issue on this appeal. In dismissing individual liability claims against Governor Cuomo, the district court ruled that the complaint failed to allege the former governor's "personal involvement in the allegedly wrongful conduct." *Id.* at *3. As to official-capacity claims against the mayor, the district court

---

[14] There is no "stand-alone cause of action" for "municipal liability." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). Rather, municipal liability obtains when the municipality "has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." *Id.*; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). We need not pursue the point further because, as stated *infra* at 18, plaintiffs agreed to have the district court dismiss their remaining claims with prejudice in order to secure an appealable final judgment.

dismissed plaintiffs' right-to-travel challenge upon concluding that the curfew survived strict scrutiny because it addressed the government's compelling interest in protecting the community from crime and was narrowly tailored to that purpose. *See id.* at *6 (noting curfew's (1) limited duration, (2) periodic updates responding to changing circumstances, (3) application only during nighttime hours, and (4) backdrop of "violence occurring in various parts of different boroughs"). The court dismissed plaintiffs' First Amendment challenge upon concluding that the curfew was a valid, content-neutral restriction on the time, place, and manner of plaintiffs' expression. *See id.* at *7 (observing that curfew left "ample alternative channels" for expressive activity). It dismissed plaintiffs' Fourth Amendment challenge because officers had probable cause to arrest them for violating the curfew. *See id.* As to claims against the mayor in his individual capacity, the district court ordered dismissal because (1) the curfew was facially lawful, and (2) there was no allegation that Mayor de Blasio was personally involved in racially discriminatory enforcement of the curfew. *See id.* at *8.[15]

After the district court denied plaintiffs' motion for entry of partial final judgment pursuant to Fed. R. Civ. P. 54(b), *see Jeffery v. City of New York*, No. 20-CV-2843 (NGG) (RML), 2022 WL 2704760, at *5 (E.D.N.Y. July 12, 2022), plaintiffs stipulated to the dismissal of their remaining claims with prejudice. Endorsing that stipulation, the district court then entered the September 23, 2022 final judgment in favor of defendants from which plaintiffs timely filed this appeal.

## DISCUSSION

### I. Standard of Review

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(6) when the pleadings fail to 'contain sufficient factual matter, accepted as true, to

---

[15] Having thus dismissed the individual-liability claims against Governor Cuomo and Mayor de Blasio, the district court did not address these defendants' alternative arguments for qualified immunity.

18

state a claim to relief that is plausible on its face.'" *Brokamp v. James*, 66 F.4th 374, 386 (2d Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Because a judgment of dismissal pursuant to Fed. R. Civ. P. 12(b)(6) can only be entered if a court determines that, as a matter of law, a plaintiff failed to state a claim upon which relief can be granted, we review that legal determination *de novo*." *Melendez v. City of New York*, 16 F.4th at 1010.

## II. The District Court Correctly Dismissed Plaintiffs' Right-To-Travel Claim

On appeal, plaintiffs challenge only the dismissal of their right-to-travel claim. *See* Appellants' Br. at 17–48; Reply Br. at 3–5 (acknowledging pursuit only of right-to-travel claim, but asserting that right derives from multiple constitutional amendments). We therefore deem plaintiffs' remaining claims abandoned and do not discuss them further. *See Jackler v. Byrne*, 658 F.3d 225, 233 (2d Cir. 2011) (deeming claims not raised in appellate brief abandoned).

With respect to their right-to-travel claim, plaintiffs argue that the district court correctly recognized that the challenged curfew had to withstand strict scrutiny to avoid being held unconstitutional, but erred in concluding as a matter of law at the pleadings stage that the curfew withstood such scrutiny. In response, defendants argue that plaintiffs' particular right-to-travel claim—implicating a temporary curfew imposed in emergency circumstances—does not warrant strict scrutiny. Nevertheless, they submit that, even applying strict scrutiny, plaintiffs' right-to-travel claim was properly dismissed under Rule 12(b)(6).

That last conclusion cannot be reached lightly. As this court has observed, when a constitutional challenge to a law triggers heightened scrutiny—whether strict or intermediate—dismissal "will rarely, if ever, be appropriate at the pleading stage." *Cornelio v. Connecticut*, 32 F.4th 160, 172 (2d Cir. 2022) (internal quotation marks omitted). Because heightened scrutiny "will frequently require the government to identify evidence[] or, at least, provide sound reasoning that

draws reasonable inferences based on substantial evidence, courts will generally wait until the summary judgment stage of the litigation to determine if the burden has been carried as a matter of law." *Brokamp v. James*, 66 F.4th at 397 (internal quotation marks omitted). "Nevertheless, in some circumstances," a heightened scrutiny "determination can be made on a motion to dismiss." *Id.* (affirming dismissal on pleadings while applying intermediate scrutiny to challenged statute); *see also Citizens United v. Schneiderman*, 882 F.3d 374, 380–85 (2d Cir. 2018) (same); *Walker v. Beard*, 789 F.3d 1125, 1135–38 (9th Cir. 2015) (affirming Rule 12(b)(6) dismissal of claim on strict scrutiny). For reasons we now explain, this is such a case.

### A. Curfew Laws

Curfew laws have a long pedigree in Anglo-American law. *See* ENCYCLOPÆDIA BRITANNICA, *Curfew* 903 (1967). The word "curfew" derives from the Old French "cuevrefu," meaning cover fire, and curfew laws were originally a fire-prevention regulation that used a bell to signal persons to extinguish or cover their fires and retire for the night. *See id.* Such laws date to the reign of Alfred the Great, with stricter enforcement under William the Conqueror. *See id.* William's strict enforcement is thought to have had a second purpose: impeding Saxon resistance to Norman rule. *See* W.L. MELVILLE LEE, A HISTORY OF POLICE IN ENGLAND 16 (1901) (stating that curfew was "intended as a check upon the Saxons, to prevent them from meeting after dark, and discussing the shortcomings of their oppressors, or for other political purposes"). Thus, since well before this country's founding, "curfew" had a dual meaning: (1) "[a] law requiring that all fires be extinguished at a certain time in the evening, usu[ally] announced by the ringing of a bell," and (2) "[a] regulation that forbids people (or certain classes of them, such as minors) from being outdoors or in vehicles during specified hours." BLACK'S LAW DICTIONARY 481 (11th ed. 2019).

The latter form of curfew was employed ignominiously in this country before the Civil War to restrict the movement of slaves and, sometimes, free Blacks. *See Jennings v. Washington*, 13 F. Cas. 547, 547 (C.C.D.C. 1838) (No. 7,284) (upholding District of Columbia curfew on "slaves, free negroes, and mulattoes"); *see also City of Memphis v. Winfield*, 27 Tenn. 707, 709 (1848) (holding that curfew law applicable to "any free negro or slave" could not "be enforced against free persons of color"). American curfew laws have also been applied to minors, with some being struck down as an "undue invasion of the personal liberty of the citizen" and an "attempt to usurp the parental functions," *Ex parte McCarver*, 46 S.W. 936, 937 (Tex. Crim. App. 1898), and others being upheld based on minors' more limited claim to protected liberty, *see Thistlewood v. Trial Magistrate for Ocean City*, 204 A.2d 688, 690–91 (Md. 1964) (collecting curfew cases and noting that few consider constitutionality of such regulations). American curfew laws have also been imposed at times of "riot or civil disorder," frequently being upheld unless imposed in the absence of statutory authority. Jeffrey F. Ghent, Annotation, *Validity & Construction of Curfew Statute, Ordinance, or Proclamation*, 59 A.L.R.3d 321, §§ 3[a], 3[b] (1974).[16] Only the last use of curfew is at issue in this case, with plaintiffs appealing dismissal of their complaint insofar as they allege a violation of the right to travel, not rights of free speech or equal protection.

## B. The Right To Travel

### 1. Constitutional Origins of Right To Travel Interstate

Although "[t]he word 'travel' is not found in the text of the Constitution," the Supreme Court has long recognized a "constitutional right to travel from one State to another," *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (internal quotation marks omitted), as "fundamental to the concept of our Federal Union," *United States v. Guest*, 383 U.S. 745, 757–58 (1966) (recognizing right to "interstate travel"); *see Shapiro v. Thompson*, 394 U.S. 618, 631 (1969) (recognizing right to interstate travel

---

[16] As noted *supra* at 12 n.8, the curfew here at issue was imposed pursuant to N.Y. Exec. Law § 24.

21

is "necessary concomitant of the stronger Union the Constitution created" (internal quotation marks omitted)), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974). As the Court long ago explained, "[w]e are all citizens of the United States, and as members of the same community must have the right to pass and repass through every part of it without interruption, as freely as in our own States." *Crandall v. Nevada*, 73 U.S. (6 Wall) 35, 49 (1867) (internal quotation marks omitted). The Court has traced this first component of the right to *interstate* travel to Article IV of the Articles of Confederation. *See Saenz v. Roe*, 526 U.S. at 501 & n.13 ("[T]he people of each State shall have free ingress and regress to and from any other State." (quoting ARTICLES OF CONFEDERATION of 1781, art. IV)).

That article, in turn, informed what the Supreme Court in *Saenz* identified as a second component of the right to interstate travel "expressly protected" by constitutional text, *i.e.*, the Privileges and Immunities Clause. *Id.* at 501; *see* U.S. CONST., art. IV, § 2 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.").[17] The Supreme Court has construed this text to mean that "by virtue of a person's state citizenship, a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits." *Saenz v. Roe*, 526 U.S. at 501 (explaining that Clause thus "removes from the citizens of each State the disabilities of alienage in the other States" (internal quotation marks omitted)).

Constitutional text, specifically, the Fourteenth Amendment, also safeguards a third component of the right to interstate travel identified in *Saenz*, *i.e.*, "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State." *Id.* at 502; *see* U.S. CONST. amend. XIV, § 1 ("No State shall make or enforce any law which shall abridge the privileges or

---

[17] *See Saenz v. Roe*, 526 U.S. at 501 n.13 (quoting 3 RECORDS OF THE FEDERAL CONVENTION OF 1787, p.112 (M. Farrand ed. 1966) stating that Privileges and Immunities Clause was "formed exactly upon the principles of the 4th article of the present [Articles of] Confederation").

immunities of citizens of the United States; nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws."). Finding the *Saenz* plaintiffs' challenge to a state rule that discriminated against citizens based on the length of state domicile to implicate this third component of the right to travel, the Supreme Court ruled neither "mere rationality nor some intermediate standard of review should be used to judge the [rule's] constitutionality." 526 U.S. at 504. The rule was subject to scrutiny "no less strict" than that applied to review of a state residency requirement for welfare benefits in *Shapiro v. Thompson*, 394 U.S. 618 (1969). *Id.*; *see id.* at 499–500 (observing that *Shapiro* held classification having effect of imposing penalty on right to travel violated Equal Protection Clause unless shown to be necessary to protect compelling governmental interest).

## 2. The Right To Travel Intrastate

Defendants submit that precedents discussing constitutional support for a right to travel *interstate* are largely irrelevant here, where plaintiffs challenge a curfew that limited their ability to travel *intrastate*.[18] To be sure, the Supreme Court has not decided whether the constitutional right to travel safeguards free movement within a given State as well as between States. *See Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 255–56 (1974) (declining to address whether Constitution protects right to "intrastate travel"). The Court has sent sometimes conflicting signals on the point. *Compare, e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 (1993) (stating that "purely intrastate restriction does not implicate the right of interstate travel"), *with City of Chicago v. Morales*, 527 U.S. 41, 54 (1999) (plurality opinion) (stating that "individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is a part of our heritage, or the right to move to

---

[18] We do not consider whether a curfew, which precludes any movement outside the home during appointed hours, necessarily limits interstate as well as intrastate travel. Plaintiffs make no such argument and, in any event, for reasons stated *infra* at 29–40, we conclude that, even on strict scrutiny, plaintiffs' intrastate travel claim fails as a matter of law on the pleadings.

whatsoever place one's own inclination may direct [as] identified in Blackstone's Commentaries" (internal quotation marks and citations omitted)), *and Papachristou v. City of Jacksonville*, 405 U.S. 156, 164 (1972) (stating that walking, loitering, and similar activities "are historically part of the amenities of life as we have known them").

We need not here try to predict whether the Supreme Court will recognize a constitutional right to intrastate travel because this court has already done so. *See, e.g.*, *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 100 (2d Cir. 2009) ("[W]e have recognized the Constitution's protection of a right to intrastate as well as interstate travel."); *Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990) ("Though the Supreme Court has dealt only with the right to travel between states, our Court has held that the Constitution also protects the right to travel freely within a single state."). In doing so, the court has not located that right in any particular constitutional text. Rather, it has identified a constitutional right to travel, whether interstate or intrastate, as fundamental to "personal liberty." *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) ("It would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state."). We recognize that Courts of Appeals are divided as to whether the Constitution affords a right to intrastate travel.[19] This panel is, of course, bound by our precedent recognizing such a right. *See United States v. Barrett*, 102 F.4th 60, 82 (2d Cir. 2024) (noting "longstanding rule that a panel of our court is bound by

---

[19] *See United States v. Baroni*, 909 F.3d 550, 587–88 (3d Cir. 2018) (collecting cases in explaining that four courts (First, Second, Third, and Sixth Circuits) recognize right to intrastate travel; while five courts (Fourth, Fifth, Seventh, Eighth, and Tenth Circuits) have declined or hesitated to do so and the Court of Appeals for the D.C. Circuit appears "internally conflicted"), *rev'd on other grounds sub nom. Kelly v. United States*, 590 U.S. 391 (2020). The Ninth Circuit has declined to decide whether a right to intrastate travel exists, *see Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 n.7 (9th Cir. 1997), while the Eleventh Circuit presumably remains bound by the Fifth Circuit's 1975 determination that no such right exists, *see generally Wright v. City of Jackson*, 506 F.2d 900, 901–02 (5th Cir. 1975); *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*) (adopting precedents of Fifth Circuit decided on or before September 30, 1981).

the decisions of prior panels until such times as they are overruled either by an en banc panel of our court or by the Supreme Court" (internal quotation marks and brackets omitted)).

This court has "not . . . sharply defined" the outer parameters of a right to intrastate travel. *Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008). It has, however, assessed the right in a variety of contexts, rejecting challenges to policies imposing only "minor restriction[s]" on travel, *see Selevan v. New York Thruway Auth.*, 711 F.3d 253, 257–60 (2d Cir. 2013) (internal quotation marks omitted) (upholding disparate bridge tolls based on residency); *see also Williams v. Town of Greenburgh*, 535 F.3d at 76 (holding that right to travel does not restrict "municipality's decision to limit access to its facilities"), while recognizing the right to extend even to victims of private actors engaged in civil rights conspiracies, *see Spencer v. Casavilla*, 903 F.2d at 175–76 (upholding civil rights conspiracy claim against private actors who, with racial animus, beat to death person traveling on public road).

As pertinent here, this court has recognized a municipal curfew to implicate the right to intrastate travel. *See Ramos v. Town of Vernon*, 353 F.3d 171 (2d Cir. 2003). At issue in *Ramos* was an as-applied challenge to a permanent nighttime curfew imposed on minors. This court recognized that such a curfew "limits the constitutional right to free movement" within the defendant town. *Id.* at 176. We held that right to extend to minors, even at night, "absent parental prohibition." *Id.* at 187. Nevertheless, because the challenged curfew affected "children's constitutional rights," which the court viewed as more circumscribed than those of adults, it applied "intermediate," rather than "strict," scrutiny. *Id.* at 180 (holding strict scrutiny "too restrictive a test to address government actions that implicate children's constitutional rights"). [20] In finding the curfew not to

---

[20] To satisfy intermediate scrutiny, the government must show that its challenged action served "important governmental objectives" and employed means "substantially related to the achievement of

25

withstand such scrutiny, the panel majority acknowledged the government's strong interest in both safeguarding "the welfare of its young citizens" and "protecting all its citizens from crime," *id.* at 181 (internal quotation marks omitted), but concluded that the government's failure to proffer evidence that crime was elevated during the curfew's nighttime hours, or that minors were either the target or cause of crime so as to warrant a curfew directed particularly at them, precluded satisfaction of the second requirement, *see id.* at 186–87. Accordingly, it declared the curfew unconstitutional and enjoined its further operation. *See id.* at 187.[21]

Thus, to the extent defendants suggest that plaintiffs' right-to-travel claim was properly dismissed because their curfew challenge alleges a limitation on only intrastate travel, that argument is foreclosed by our controlling precedent. At the same time, our precedent appears to recognize that the right to travel, like most constitutional rights, is not unlimited. *Cf. United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (making point with respect to Second Amendment rights).

### 3. Heightened Scrutiny

At the same time this court subjected the juvenile curfew in *Ramos* to an intermediate form of heightened scrutiny, it "assume[d]" that if the challenged curfew had "applied to adults, it would be subject to strict scrutiny." 353 F.3d at 176. The curfew here at issue plainly applied to adults. Nevertheless, *Ramos*'s "assumption" does not necessarily dictate strict scrutiny for two reasons. First, *Ramos*'s strict-scrutiny assumption was based on a hypothetical curfew applicable

---

those objectives." *Ramos v. Town of Vernon*, 353 F.3d at 180 (internal quotation marks omitted). To satisfy strict scrutiny, the government must show that its challenged action served "a compelling governmental interest" and employed means "narrowly tailored" to that interest. *Selevan v. New York Thruway Auth.*, 711 F.3d at 257–58 (internal quotation marks omitted); *see also Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. at 734.

[21] In dissent, then-Senior Judge Winter questioned minors' possession of a constitutional right to travel and maintained that, in any event, the challenged ordinance survived "any level of scrutiny." *Ramos v. Town of Vernon*, 353 F.3d at 189, 196.

to adults and, thus, is non-binding *dictum*. *See, e.g., Jimenez v. Walker*, 458 F.3d 130, 142 (2d Cir. 2006) (explaining that while "[h]oldings—what is necessary to a decision—are binding," "[d]icta—no matter how strong or how characterized—are not" (internal quotation marks omitted)); *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 134 (2d Cir. 1993) (concluding that statement in prior case was *dicta* "because it goes beyond the facts of the case").

Second, unlike the permanent curfew at issue in *Ramos*, the challenged curfew here was ephemeral, operating for approximately one week in response to a declared emergency. Defendants argue that whatever standard pertains for scrutinizing the constitutionality of a permanent curfew, a more deferential standard should apply to a temporally limited curfew imposed in time of emergency. In support, they point us to *United States v. Chalk*, 441 F.2d 1277 (4th Cir. 1971).

At issue in *Chalk* was a three-night curfew imposed on all residents of Asheville, North Carolina, in the wake of a violent clash between police officers and high school students. *See id.* at 1278. The Fourth Circuit upheld that curfew as a constitutional exercise of the mayor's emergency authority. While acknowledging that a mayor's "decision that civil control has broken down to the point where emergency measures are necessary is not conclusive or free from judicial review," the court concluded that judicial review of such a decision was properly "limited to a determination of [1] whether the mayor's actions were taken in good faith and [2] whether there is some factual basis for his decision that the restrictions he imposed were necessary to maintain order." *Id.* at 1281. Answering both questions in the affirmative, the court upheld the challenged curfew. *Id.* at 1281–82; *see also Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996) (using *Chalk* standard in upholding months-long curfew imposed on residents of Dade County, Florida in aftermath of Hurricane Andrew), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).

After careful review, we are not persuaded to apply *Chalk*'s deferential standard to the curfew in this case. As this court recently stated, "we grant no special deference to the executive when the exercise of emergency powers infringes on constitutional rights." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020). Thus, we continue to apply a level of heightened scrutiny to curfews challenged as violating the right to travel.

In applying heightened scrutiny here, we are nevertheless mindful that the challenged curfew was temporally limited to one week and imposed in response to a declared emergency. As to the latter, this court has observed that "the uncertainties that accompany many novel emergencies" may require government officials to make difficult decisions and call "for a measure of humility on the part of the reviewing judge." *Id.* Recognizing government officials to have "wide latitude in issuing emergency orders to protect public safety or health," however, does not warrant giving such officials "*carte blanche* to impose any measure without justification or judicial review." *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1179 (11th Cir. 2020); *see Melendez v. City of New York*, 16 F.4th at 1041. If governments are better able to justify actions taken in response to civic exigencies, it is not because relaxed judicial scrutiny applies to such measures but, rather, because government responses to such emergencies are more likely to satisfy heightened scrutiny. *Cf. Bykofsky v. Borough of Middletown*, 429 U.S. 964, 965 (1976) (Marshall, *J.*, joined by Brennan, *J.*, dissenting from denial of certiorari) (concluding that strict scrutiny applied to curfew ordinance while expressing "little doubt but that, *absent a genuine emergency*, see e.g., *United States v. Chalk*, 441 F.2d 1277 (C.A.4 1971), a curfew aimed at all citizens could not survive constitutional scrutiny" (emphasis added)).

In sum, even recognizing that the challenged curfew was temporally limited and responsive to an emergency, we conclude that it is properly subjected to some level of heightened scrutiny. Rather than conclusively decide whether that

28

scrutiny should be intermediate or strict, we apply the latter and, upon doing so, conclude, as the district court did, that plaintiffs fail plausibly to plead a violation of the constitutional right to travel.

### C. The Challenged Curfew Satisfies Strict Scrutiny

To satisfy strict scrutiny, the government must show that its challenged policy "is narrowly tailored to serve a compelling governmental interest." *Selevan v. New York Thruway Auth.*, 711 F.3d at 257–58 (internal quotation marks omitted); *see Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. at 734 (stating standard). "While this is a heavy burden, it is not true that strict scrutiny is strict in theory, but fatal in fact." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014) (internal quotation marks omitted); *see Walker v. Beard*, 789 F.3d at 1135–38 (concluding on pleadings that government satisfied strict scrutiny).

### 1. Compelling State Interest

As the Supreme Court has stated, "[t]he legitimate and compelling state interest in protecting the community from crime cannot be doubted." *Schall v. Martin*, 467 U.S. 253, 264 (1984) (internal quotation marks omitted). This court too has recognized as "beyond cavil that . . . states have substantial, indeed, compelling, governmental interests in public safety and crime prevention." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015).

Plaintiffs do not seriously dispute that preventing crime and maintaining civil order are compelling state interests. Rather, they submit that the interest cannot be defined "at a high level of generality" and must be analyzed in the particular context in which it is asserted. *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021). We agree. Nevertheless, we conclude from the pleadings and judicially noticeable facts detailed in the Background section of this opinion that there can be no question that defendants imposed the challenged curfew to serve a compelling state interest in curbing escalating nighttime crime and disorder

29

occurring unpredictably throughout the City that was resisting control by traditional means of policing.

In urging otherwise, plaintiffs submit that the severity of the crime problem prompting imposition of the challenged curfew can reasonably be disputed because daily arrests were then lower than they had been in January and February 2020. The argument fails because it ignores a salient fact: the intervening surge in the COVID-19 pandemic, which, in March 2020, resulted in numerous mandated and voluntary limits on public activity that necessarily brought a decline in all such activity, criminal as well as lawful. *See supra* at 3 n.1. In any event, the general decline in crime highlighted by plaintiffs cannot refute what they themselves acknowledge, *i.e.*, that when the challenged curfew was imposed, "there were tumultuous and confrontational moments in some areas in the City and even incidents of looting, destruction of property, and violence" arising unpredictably across the City. Compl. ¶ 14 ; *see supra* at 6–14 (referencing contemporaneous news reports of violence and property destruction throughout City, as well as subsequent DOI report confirming such activity and compiling NYPD statistics detailing sharp increase in criminal activity).

Plaintiffs nevertheless insist that no *compelling* interest in restoring order can be identified as a matter of law because such criminal behavior was "extremely limited," Compl. ¶ 30, and engaged in by only "a small number of individuals," *id.* ¶ 14. We disagree. First, there is always a compelling public interest in stopping violence and lawless destruction of property. Whether the means chosen to do so—here, a week-long, nighttime curfew—is narrowly tailored in light of its effect on the right to travel is properly addressed at the second, not the first, step of strict scrutiny. In any event, in a City with a population exceeding eight million, the participation of several hundred—perhaps even several thousand—people in an activity might appear a relatively small or limited number. But when that activity is violence, looting, and destruction, and when it occurs at unpredictable

30

locations across the City and escalates over several days, it cannot be disputed that the public has a compelling interest in government officials curbing that criminality and restoring order.

Thus, we conclude as a matter of law that strict scrutiny's first demand, for a compelling public interest, is here satisfied. We proceed to consider its second demand for narrow tailoring.

### 2. The Challenged Curfew Was Narrowly Tailored To Reduce Crime and Restore Public Order

"Narrow tailoring requires the government to demonstrate that a policy is the least restrictive means of achieving its objective." *Agudath Israel of Am. v. Cuomo*, 983 F.3d at 633 (internal quotation marks omitted). This requires a showing that there are no "less restrictive alternatives [that] would be at least as effective in achieving" the objective. *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 878 (2d Cir. 2008) (internal quotation marks omitted and alteration in original).

Plaintiffs fault the district court for simply "assum[ing]" that the challenged curfew was narrowly tailored to advance the defendants' professed objective of reducing crime and public disorder. Appellants' Br. at 23. We are not persuaded that the district court relied only on an assumption in granting dismissal. In any event, on our own *de novo* review, we conclude that the requisite narrow tailoring is demonstrated as a matter of law by the totality of the pleadings and judicially noticeable facts.[22]

In part, narrow tailoring is indicated by the fact that the City imposed the curfew only after contemplating alternative courses of action. To explain, as plaintiffs acknowledge, the challenged curfew was no general crime-control

---

[22] While we necessarily discuss points indicative of narrow tailoring individually, it is by considering them in total that we reach the tailoring conclusion compelling dismissal. Thus, we do not here decide whether a curfew imposed in different circumstances would survive strict scrutiny.

measure; rather, it was imposed in response to a particular "tumultuous and confrontational moment[]" in the City's history. Compl. ¶ 14. That moment began on or about May 28, 2020, when "thousands" of demonstrators, motivated by George Floyd's death at the hands of Minneapolis police, gathered "in various sections of the [City's] five boroughs to protest police brutality against Black and minority communities." *Id.* ¶ 11. From the first, at least some demonstrators engaged in unlawful conduct, *e.g.*, blocking major transportation arteries, breaking store windows, destroying police vehicles, and setting fires. *See supra* at 8–11. Many demonstrations devolved into physical, even violent, confrontations with police. *See id.* Mayors in other cities, experiencing similar disturbances in connection with Floyd demonstrations, imposed curfews and/or deployed the National Guard. *See supra* at 10; *see also Verastique v. City of Dallas*, 106 F.4th 427, 430 (5th Cir. 2024) (explaining that, in Dallas, Floyd "demonstrations ultimately devolved into several days of riots, destruction of property, and assaults on police" (internal quotation marks omitted)); *Marks v. Bauer*, 107 F.4th 840, 842 (8th Cir. 2024) (describing "damage caused by rioting and looting" in Minneapolis following Floyd protests); *United States v. Pugh*, 90 F.4th 1318, 1323 (11th Cir. 2024) (explaining that, in Mobile, Alabama, Floyd protest "devolved into a riot," resulting in federal criminal charges); *Packard v. Budaj*, 86 F.4th 859, 862 (10th Cir. 2023) (explaining that, during Floyd protests, Denver mayor declared state of emergency, imposed curfew, and requested assistance from mutual aid police departments); *United States v. Olson*, 41 F.4th 792, 795 (7th Cir. 2022) (stating that "[l]ike many major American cities, Madison, Wisconsin was embroiled in violent and disruptive protests during the weekend of May 30–31, 2020, in the wake of George Floyd's death," with "crowds of hundreds engaged in rampant looting, vandalism, arson, and widespread violence"). Mayor de Blasio, however, initially chose not to do so. Voicing support for demonstrators' right to protest peacefully and noting that the vast majority of demonstrators were in fact peaceful, he

32

continued to address unlawful conduct and outbreaks of violence through traditional policing. *See supra* at 10.

By June 1, however, it became evident that traditional policing, even with greater numbers of officers, was inadequate to curb violence and destruction across the City. Indeed, such criminality was increasing, both in numbers and severity, as confirmed by the very NYPD arrest statistics otherwise relied upon by plaintiffs in their pleadings. On the night of May 31, physical confrontations between police and protesters had grown more numerous and aggressive, additional fires had been set, greater property damage had been caused, and brazen looting had increased in more parts of the City. *See supra* at 11. Also, that night, police lives were threatened, with shots fired at one officer sitting inside a marked police vehicle in Queens, and another officer struck by a motor vehicle in Manhattan. *See id.* In total, 349 people were arrested across the City, 34 police officers were reported injured, and 13 police vehicles were damaged in a single night. *See id.* Only at that point did Mayor de Blasio, in consultation with the City's police commissioner and Governor Cuomo, decide to impose a curfew. As the mayor noted at a June 2 press conference, "[w]e did not expect [the looting that] started Sunday night at nine." Press Conference Tr.

Narrow tailoring is further evident from the limited scope of the challenged curfew. Initially, it was ordered for a single night and for only six hours, from 11:00 p.m. on June 1 to 5:00 a.m. on June 2. Those hours, which coincided with much of the worst violence and destruction then experienced, were also when most law-abiding persons were already likely to be in their homes rather than

traveling outside.[23]  The initial curfew thus left New Yorkers free to travel as they wished for eighteen hours of every day.[24]

The curfew was also narrowly tailored in that it provided exceptions for persons who particularly needed to be outdoors during curfew hours: police officers, firefighters, persons engaged in certain essential work, persons in need of medical care or supplies, and homeless persons without access to shelter.  *See supra* at 13.

Thus, to the extent plaintiffs complain that the imposition of *any* curfew violated their constitutional right to travel, their claim was properly dismissed because the pleadings and judicially noticeable facts admit no dispute that (1) the curfew addressed a legitimate and compelling state interest in protecting the community from violence and destruction; (2) traditional policing had proved inadequate to curb that criminality, which was in fact escalating; and (3) the initial curfew was narrowly tailored as to duration, hours, and exceptions to address the compelling public interest with minimal intrusion on the right to travel.  Thus, the initial curfew withstands strict scrutiny as a matter of law.[25]

The same conclusion applies to curfew extensions ordered on June 1 and 2: the first extending the curfew for one more night from 8:00 p.m. on June 2 to 5:00

---

[23] This likelihood was greatly enhanced in May-June 2020 by various state and local orders, imposed in response to the coronavirus pandemic, which limited the numbers and venues in which persons could congregate.  *See, e.g.*, *supra* at 3 n.1.

[24] We need not here decide whether such a temporally limited curfew might be analogized to a time, place, and manner restriction on First Amendment rights which, when content neutral, need survive only intermediate scrutiny.  *See, e.g.*, *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 202 (2d Cir. 2013).  Here we conclude only that the curfew's temporal limit is one of many factors demonstrating that it was narrowly tailored to address the City's compelling interest in curbing escalating violence and destruction and restoring public order.

[25] In urging otherwise, plaintiffs point to a June 1, 2020 statement by the City's police commissioner expressing skepticism that a curfew would quell rioters.  The statement does not indicate that the commissioner thought a curfew was *more* than the least necessary to curb crime and restore order.  Rather, it indicates concern as to how effective a curfew would be if people did not heed it.

a.m. on June 3, and the second extending that curfew until June 8, a period of almost a week.[26]  Focusing on the longer curfew extension, its narrow tailoring is evident from pleadings and indisputable facts.

Specifically, the one-week curfew, like the initial curfew, was tailored to apply only during nighttime hours, which was when violence, property damage, and looting were escalating in the city.  As Mayor de Blasio acknowledged in announcing the extended curfew, Floyd demonstrations continued to be "overwhelmingly peaceful" during the daytime on June 1.  Press Conference Tr. It was when night fell that there was "a lot of trouble in some parts of the city." *Id.*; *see supra* at 13–15; Compl. ¶ 46.

While the extended curfew's operation from 8:00 p.m. to 5:00 a.m. limited law-abiding persons' freedom of movement for nine hours—three hours more than the initial curfew—this time span was nevertheless narrowly tailored to the time of most compelling public interest in curbing escalating crime.[27]  Law-abiding persons, including peaceful Floyd demonstrators, remained free to travel wherever they wished for fifteen hours of each day, subject only to COVID-related limitations.  Mayor de Blasio effectively made this point when, in announcing the extended curfew, he asked Floyd demonstrators who wished to continue their peaceful protests to "do it in the daytime hours and then please go home, because we have work to do this evening to keep a peaceful city."  Press Conference Tr. The extended curfew, like the initial curfew, was also narrowly tailored by various exceptions for certain workers and homeless persons.

---

[26] June 8 coincided with the governor's announced plan to lift certain restrictions imposed in response to the COVID-19 pandemic. *See New York City Is Expected to Open June 8, Cuomo Says*, N.Y. TIMES (May 29, 2020), nytimes.com/2020/05/29/nyregion/coronavirus-new-york-live-updates.html [perma.cc/U6MH-BVPT] (reporting that City would begin phase 1 of reopening of certain nonessential businesses on June 8).

[27] We note that sunset on June 1, 2020, was 8:22 p.m. and sunrise on June 2, 2020, was 5:26 a.m., hours that roughly equate to those of the extended curfew.

Most important, the extended curfew was limited to one week. That distinguishes this case from *Ramos v. Town of Vernon*, 353 F.3d 171, which involved a curfew of indefinite duration. *See generally Tinius v. Choi*, 77 F.4th 691, 700–01 (D.C. Cir. 2023) (observing, in context of First Amendment challenge triggering intermediate scrutiny, that challenged three-night curfew was "very different" from permanent curfew).

Moreover, the pleadings and judicially noticeable facts admit no dispute that a one-week curfew was imposed only after a one-night curfew, together with increased policing, had proved inadequate to curb escalating crime on the night of June 1. Plaintiffs' Complaint acknowledges "property destruction, vandalism, and looting" along Fordham Road in the Bronx, in Manhattan along Sixth Avenue, in Herald Square, in the Diamond District, and in SoHo, and in Brooklyn near the Barclays Center. Compl. ¶ 16. Detailing some such events, the DOI states that, "[b]y 10:00 p.m." on June 1, "there were reports of widespread looting of commercial businesses in Midtown and Lower Manhattan, including at Macy's Department Store in Herald Square." DOI Report at 15. "Significant looting" also occurred in the Bronx in the late evening and the early morning of June 2, "notably in the commercial corridor along Fordham Road in the western Bronx, and at the Bay Plaza Shopping Center . . . in the eastern Bronx." *Id.* at 16. From 4:00 p.m. on June 1 to 4:00 a.m. on June 2, police statistics report "approximately fifty-one ATM robberies . . . , 23% occurring in the Bronx's 46th precinct alone, and 2,319 'commercial burglary' 911 calls." *Id.*[28]

In addition, Mayor de Blasio apparently considered and rejected alternative measures, including the suggestion that he seek intervention by the National Guard. *See* Press Conference Tr. (explaining that he did not think it necessary or "wise" to employ the National Guard, which was "not trained for the

---

[28] DOI noted that in previous weeks, "the same twelve-hour period . . . typically produced fewer than 50 commercial burglary 911 calls." DOI Report at 16.

circumstance" then confronting the City).[29] The City also made ongoing assessments of the curfew, which resulted in its early termination on June 7 as reports of violence, destruction, and attending arrests steadily declined over five days. *See supra* at 15. While such ongoing assessment and early termination may not, by themselves, be dispositive, they are strong indicators of narrow tailoring. *See generally United States v. Sec'y of Hous. & Urban Dev.*, 239 F.3d 211, 220 (2d Cir. 2001) (concluding, on strict scrutiny, that race-conscious measures that were both "flexible and ephemeral" were narrowly tailored to advance compelling governmental interest (internal quotation marks omitted)).

In these specific and well-documented circumstances, extending the curfew for one week—while retaining (and, in fact, exercising) the discretion to end it early if circumstances improved—must be recognized as a matter of law as the least restrictive means then available to defendants to prevent escalating crime and to restore order in the City.

In urging otherwise, plaintiffs submit that a less restrictive means for curbing crime and restoring order would have been to cabin the curfew "to the specific areas [of the City] where criminality was occurring." Appellants' Br. at 27. Plaintiffs' Complaint, however, fails to allege facts plausibly indicating that criminality was limited to discrete areas of the City. They make "mere conclusory statements" to that effect, which we need not credit. *Ashcroft v. Iqbal*, 556 U.S. at 678; *see* Compl. ¶ 15. Indeed, such a conclusory assertion is belied not only by the specific events detailed in contemporaneous media reports,[30] and the subsequent

---

[29] As noted *supra* at 10, other cities experiencing criminal activity in conjunction with Floyd demonstrations had reportedly begun to deploy the National Guard in addition to imposing curfews.

[30] *See, e.g.*, NYTimes, May 30, 2020 (describing protesters moving "through Harlem, the East Village, Times Square, Columbus Circle, Jackson Heights in Queens, the Flatbush section of Brooklyn and portions of the Bronx and Staten Island, sometimes seeming to move independently but at other moments appearing to break apart, come together and re-splinter in a way that tested the ability of the police to maintain control"; demonstrators pelting police vehicle in Park Slope, Brooklyn; "bottles and firebombs"

statistically documented DOI Report, but also by plaintiffs' pleadings, *see* Compl. ¶ 16 (quoted *supra* at 36). These indisputably show that, while criminality was sometimes localized, it occurred across many parts of the City with persons frequently migrating from certain locations to others, even across boroughs, in ways that were not always predictable. In such dynamic circumstances, strict scrutiny's demand for the use of a least restrictive alternative did not require defendants to assume that criminal activity would be confined only to certain City neighborhoods or to limit a curfew order to those neighborhoods.[31]

Our narrow tailoring conclusion finds support in decisions of two of our sister circuits reviewing First Amendment challenges to curfews on intermediate scrutiny: *Tinius v. Choi*, 77 F.4th 691 [D.C. Cir.], and *Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005). In *Tinius*, the court upheld the Rule 12(b)(6) dismissal of a challenge to a curfew that, like the one here at issue, was imposed to curb "rioting, vandalism, looting, and arson" attending otherwise peaceful Floyd demonstrations. 77 F.4th at 696.[32] Employing reasoning similar to our own, the D.C. Circuit concluded that extension of the D.C. curfew from one night to an additional two nights was "narrowly tailored" because the extension was "limited" and "temporary" and imposed "in response to a spike in serious crime" that was particularly prevalent at night. *Id.* at 700. In these circumstances, the court ruled that the mayor's "measured approach show[ed] tailoring to the public safety interest." *Id.* Further, although the *Tinius* plaintiffs had not challenged the

---

being hurled at police outside Brooklyn's Barclays Center; and protesters smashing window of police S.U.V. at 14th Street and Fourth Avenue in Manhattan).

[31] Such an endeavor can raise other concerns. *See, e.g.*, *Hutchins v. District of Columbia*, 188 F.3d 531, 544 (D.C. Cir. 1999) (*en banc*) (plurality opinion) (rejecting argument that District "was obliged to confine the curfew to high-crime areas of the city," which "would have opened the Council to charges of racial discrimination"); *but see Washington v. Davis*, 426 U.S. 229, 242 (1976) (rejecting proposition that "law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another").

[32] The D.C. Circuit declined to address plaintiffs' right-to-travel challenge to the curfew, deeming the argument forfeited by the failure to raise it in the district court. *See Tinius v. Choi*, 77 F.4th at 706.

citywide scope of the D.C. curfew, the court concluded that such an application was justified by the curfew order's recounting of "vandalism . . . across multiple areas of the city." *Id.* at 701–02.

In *Menotti v. City of Seattle*, the Ninth Circuit upheld an award of summary judgment in favor of defendants on a facial challenge to a Seattle order precluding entry into parts of the city during a meeting of the World Trade Organization ("WTO"). *See* 409 F.3d at 1118. Like the curfew here, that order was imposed in the wake of protests, some of which included looting, property destruction, the use of Molotov cocktails, and assaults on law enforcement officers, WTO delegates, and members of the public. *See id.* at 1120–23 (observing that "disruption of normal city life was so extreme in some locations that it bordered on chaos"). The Ninth Circuit concluded that the order satisfied intermediate scrutiny because it was narrowly tailored to serve Seattle's "significant interest in maintaining public order, . . . a core duty that the government owes its citizens." *Id.* at 1131. The court explained that "once multiple instances of violence erupt, with a breakdown in social order," a city is permitted to "act vigorously . . . to restore order for all of its residents and visitors." *Id.* at 1137.

The curfew here, like the curfew in *Tinius*, was imposed in response to documented violence, destruction, and looting "across multiple areas" of a large, densely populated city. 77 F.4th at 702. The curfew here, like the preclusion order in *Menotti*, was imposed in response to criminality "border[ing] on chaos." 409 F.3d at 1121. Further, as in *Tinius*, the City here employed a "measured approach" to curb criminal activity. 77 F.4th at 700. It first relied on traditional policing; then, when criminality escalated, it supplemented traditional policing with a one-night curfew; then, when criminality continued to escalate, it extended the curfew for an additional six nights; and finally, when conditions improved and stabilized, the City ended the curfew one night early. *See id.* at 696–97, 700. In these circumstances, even on strict scrutiny, we conclude as a matter of law that the

extended curfew was narrowly tailored to employ the least restrictive means to serve the City's compelling public interest in curbing escalating crime and restoring order.

The challenged curfew satisfying both requirements of strict scrutiny, we conclude that plaintiffs fail as a matter of law to state a plausible claim for violation of their right to travel and, accordingly, we affirm dismissal of that claim as against all defendants.[33]

## CONCLUSION

For the reasons stated in this opinion, we conclude that the district court correctly dismissed plaintiffs' right-to-travel challenge to a week-long nighttime curfew imposed in New York City to curb escalating violence, destruction, and looting occurring in conjunction with otherwise peaceful demonstrations protesting the Minneapolis death of George Floyd. Upon *de novo* review, we conclude that the challenged curfew withstands even strict scrutiny.

Accordingly, we **AFFIRM** the judgment of dismissal.

---

[33] Having so concluded, we need not consider defendants' further argument that insofar as Mayor de Blasio and Governor Cuomo are sued in their individual capacities, dismissal was warranted on grounds of qualified immunity. Nor need we address Governor Cuomo's argument that plaintiffs failed to allege his personal involvement in the imposition of the curfew.

40